# In the United States Court of Federal Claims

No. 20-932
Filed: April 22, 2025

|  |  |
|---|---|
| KOTIS ASSOCIATES, LLC, *et al.*, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) |
| THE UNITED STATES, | ) |
| | ) |
| Defendant. | ) |

*Lindsay S.C. Brinton*, Lewis Rice LLC, St. Louis, MO, for plaintiffs.

*Krystal-Rose Perez*, U.S. Department of Justice, Washington, DC, for defendant.

## OPINION AND ORDER

***SMITH,*** **Senior Judge**

This just compensation case arises from the "rails-to-trails" conversion of a 3.1-mile railroad corridor between Milepost CF-65.6 and Milepost CF-68.7 ("the Corridor") in Greensboro, North Carolina. The former railroad right of way ("ROW") was converted, with the approval of the Surface Transportation Board ("STB") and by virtue of it, into a new easement for trail use subject to preservation for future rail use, known as an interim trail use and railbanking easement ("ITUR easement"). The former railroad ROW was owned by Norfolk Southern Railway Company ("Norfolk Southern"). The new ITUR easement is owned and operated by the City of Greensboro ("the City"), the trail sponsor.

Plaintiffs are three entities controlled by Mr. William Kotis: Kotis Associates, LLC; Kotis Holdings, LLC; and Westover Terrace II, LLC (collectively, "Kotis Entities"). The Kotis Entities together own thirteen parcels underlying and immediately adjacent to the Corridor. Defendant, the United States, has conceded liability, so that the only question before the Court is the amount of just compensation owed. The Kotis Entities presented expert valuation testimony and seek upwards of $44,744,774.00 plus interest. The United States presented expert rebuttal testimony questioning the reliability of plaintiffs' expert, but also maintains that plaintiffs are entitled to no compensation because (1) their property would have been burdened by an easement even without the taking; and (2) the ITUR easement is narrow in width and nonexclusive in scope. Also pending before the Court is plaintiffs' motion for partial

summary judgment as to the rate of interest, ECF No. 173, and defendant's motion to reopen the trial record, ECF No. 188.

For the reasons provided below, the Court grants plaintiffs' motion for partial summary judgment; denies defendant's motion to reopen the record; and concludes that the quantum of compensation owed to plaintiffs is far from nominal. The Court awards just compensation in the amount estimated by plaintiffs' expert, subject to some modifications. Interest to be calculated using Moody's Aaa Corporate Bond Rate, compounded annually.

## I.    Background

A rails-to-trails conversion is simply a series of real estate transactions involving three players: the potential trail sponsor, the railroad company, and local landowners. The sponsor's objective is to acquire, within the rail corridor or a portion of it, the right to establish a trail *not* subject to interference by another dominant estate. When a party (whether a railroad or a local landowner) owns the portion in fee and there is no dominant estate, acquisition is bilateral. But matters are less straightforward when the estate is split between the railroad and the landowners. This Court's "rails-to-trails" jurisprudence involves the scenario where the estate is split thus: The railroad holds a dominant easement in the corridor for "railroad purposes"—but not for trail purposes; while the "fee estate[] remain[s] with [adjacent] property owners." *Preseault v. United States*, 100 F.3d 1525, 1530 (Fed. Cir. 1996) (en banc) (plurality opinion) ("*Preseault III*"). In this scenario, the sponsor has no straightforward way to acquire an unencumbered trail easement. The *railroad* cannot convey the right to use the corridor for trail purposes because it does not possess that right, and *landowners* cannot convey it because their rights are servient to the railroad's dominant estate.

Sponsors can get around this problem in two ways. First, they can simply wait for the railroad to abandon the corridor and then make a deal with landowners. Call this a "post-abandonment" rail-trail conversion. Second, if the railroad refuses to abandon the corridor, the sponsor's only hope is to acquire a congressionally-created ITUR easement under the "Railbanking Provision" of the National Trails System Act Amendments of 1983 ("Trails Act").[1] Call this a "pre-abandonment" or "Trails Act" rail-trail conversion.

The sponsor in this case, the City, acquired two adjacent corridors, one post-abandonment, and the other—the Corridor that is the subject of this litigation—via the Trails Act. Although only the second acquisition implicates a federal taking, a comparison of the two sheds light on how a Trails Act taking alters the rights of landowners. The Court therefore recounts the legal and factual background for both acquisitions.

### A.  Legal Background

---

[1]      Pub. L. No. 98-11 § 208(2), 97 Stat. 42, 48 (codified at 16 U.S.C. § 1247(d)).

### 1. Post-abandonment rail-trail conversions

A post-abandonment conversion is triggered when a rail corridor no longer finds it profitable to continue its ownership of a railroad ROW. It may seem counterintuitive that railroads would want to voluntarily extinguish their property interest, but railroads have strong incentives to abandon inactive rail lines, as opposed to merely deactivating or "discontinuing" services. "If the railway company retains the line but discontinues service . . . , the company accepts significant costs, including taxes and maintenance expenses, and risks of tort liability. Because abandonment avoids these costs, railway companies seeking [STB] authorization to cease operations on money-losing lines naturally prefer abandonment to discontinuance." *Preseault v. United States* ("*Preseault II*"), 66 F.3d 1167, 1182–83 (Fed. Cir. 1995), *vacated*, 66 F.3d 1190, *rev'd* 100 F.3d 1525 (Fed. Cir. 1996) (en banc); *see also Glosemeyer v. United States*, 45 Fed. Cl. 771, 775 (2000).

The railroad obtains the STB's authorization to abandon by initiating one of several types of abandonment proceedings. The default proceeding is lengthy. 49 U.S.C. § 10903; *see Chicago & N.W. Transp. Co. v. Kalo Brick & Tile Co.*, 450 U.S. 311, 321 (1981). However, the STB has also created so-called "exempt" proceedings, through which railroads may receive the "authority to abandon" without "prior review and approval," for lines that have seen "no local traffic . . . for at least 2 years" and also meet certain other conditions.[2]  49 C.F.R. § 1152.50(b), (c). Railroads initiate this proceeding by filing a "notice of exemption," and, in the ordinary course, automatically receive the authority to abandon the line after fifty days. *Id.* § 1152.50(d)(3). Once the railroad exercises its authority to abandon[3]—that is, once it "consummates" the abandonment—the railroad is out of the equation, and the sponsor can acquire an unencumbered trail easement from the adjacent landowners.

### 2. Pre-abandonment or Trails Act conversions

Post-abandonment rail-trail conversions may benefit sponsors and landowners,[4] but they also permanently remove the corridor in question from the Nation's railway

---

[2]    The other conditions are: "[A]ny overhead traffic on the line can be rerouted"; and the line is not subject to an ongoing or recent dispute brought by a shipper. 49 C.F.R. § 1152.50(b).

[3]    The railroad's authority to abandon ordinarily expires in one year, and if the railroad does not consummate the abandonment within that period, "a new proceeding [has] to be instituted if the railroad wants to abandon the line." 49 C.F.R. § 1152.29(e)(2).

[4]    Sponsors may prefer post-abandonment conversions whenever they and landowners share a mutual interest in tailoring the dimensions of the trail. For example, the parties may agree to narrow or reroute segments of the trail to enable landowners to make productive use of the land—which would benefit not just landowners but also the sponsor, if the sponsor's aim is to promote economic development along the trail and (when the sponsor is a local government) enhance its tax base. *See* Danaya C. Wright & Jeffrey M. Hester, *Pipes, Wires, and Bicycles: Rails-to-Trails, Utility Licenses, and the Shifting Scope of Railroad Easements from the Nineteenth to the Twenty-First Centuries*, 27 Ecology L.Q. 351, 357 (2000) (noting that rail-trails "link neighborhoods, schools, and shopping areas," and that "the greatest success story of the Rails-to-Trails movement has been the revitalization

network.  The Trails Act addresses this problem by rearranging property rights as between the railroad and adjacent landowners.  The operative provision of the Act, the Railbanking Provision, provides that an ROW for railroad purposes is not deemed abandoned if it is converted to a trail, as long as (1) the trail use is "interim," meaning that it is "subject to restoration or reconstruction for railroad purposes" (colloquially, "railbanked"); and (2) the sponsor "is prepared to assume full responsibility for management of such rights-of-way and for any legal liability arising out of such transfer or use, and for the payment of any and all taxes that may be levied or assessed against such rights-of-way."  16 U.S.C. § 1247(d).

In other words, the Railbanking Provision creates the option of converting the railroad's estate to include a "new and different" easement—the ITUR easement. *Toews v. United States*, 376 F.3d 1371, 1381 (Fed. Cir. 2004); *Preseault III*, 100 F.3d at 1550 ("a new easement for [a] new use").  Furthermore, the STB's implementing regulations assign the contingent property right—the *option* of converting a railroad ROW into an ITUR easement—to the railroad, because the new ITUR easement can be established only with the railroad's consent.  49 C.F.R. § 1152.29(b)(2); *see also Nat'l Wildlife Fed'n v. ICC*, 850 F.2d 694, 696 (D.C. Cir. 1988) (rejecting, based on *Chevron* deference, the argument that the Railbanking Provision "requires the [STB] to transfer rights-of-way to qualified trail operators even when the railroad opposes such use").  By assigning the option right to the railroad, the STB grants the railroad an exclusive trail-use 'license,' which they can sell to sponsors in exchange for the transfer of all costs associated with liability, tax obligations, and corridor maintenance, 16 U.S.C. § 1247(d), *plus* lumpsum payments—all without losing the right to reactivate rail service in the future.

In this way, the railroad ROW is transformed from a liability that the railroad wished to get off its books, into a lucrative asset that the railroad will retain as long as it expects a current *or future* sponsor to buy the license.

More specifically, the railroad sells the ITUR license through a proceeding—call it the trail-use proceeding—created by the STB to implement the Railbanking Provision.  The proceeding is folded into the exemption proceeding described earlier in this opinion.  *See* Part I.A.1, *supra*.  After the railroad files the notice of exemption and it is published in the Federal Register, potential trail sponsors have twenty days to file a "petition for interim trail use."  49 C.F.R. § 1152.29(b)(1), (2).  The petition must contain, among other things, "[a] map depicting, and an accurate description of, the right-of-way, or portion thereof . . . , proposed to be acquired or used."  *Id.* § 1152.29(a)(1).  The railroad then informs the STB whether it agrees to negotiate an ITUR agreement.  *Id.* § 1152.29(b)(2).  If the railroad agrees, the STB issues a Notice of Interim Trail Use ("NITU"), which has the effect of staying the notice of exemption while the sponsor and the railroad negotiate.  *See id.* §1152.29(d)(2).  If negotiations

_____

of innumerable small towns").  Sponsors may also be able to save money by acquiring the corridor through donations, bargain sales, or land swaps.  *See* Rails to Trails Conservancy, *Acquisition Strategy*, https://www.railstotrails.org/trail-building-toolbox/acquisition-strategy/ (last visited on April 22, 2025).

are successful, the trail sponsor and railroad do not need further approval from the STB; they can make the NITU permanent simply by "jointly notify[ing] the [STB] within 10 days that the agreement has been reached." *Id.* § 1152.29(h).[5] If negotiations fail, the NITU "automatically converts into an effective . . . notice of abandonment." *Preseault v. United States*, 494 U.S. 1, 7 n.5 (1989) ("*Preseault I*"); 49 C.F.R. § 1152.29(d)(1).

Even when negotiations fail, however, the Trails Act remains in the picture, because the railroad can choose not to consummate the abandonment. 29 C.F.R. § 1152.29(e)(2). In that scenario, the railroad retains the authority to file a new notice of exemption and work with the same sponsor or other sponsors to obtain a follow-on NITU. *See, e.g.*, *Barclay v. United States*, 443 F.3d 1368, 1375–78 (Fed. Cir. 2006).

The trail use proceeding resembles a direct condemnation action in some respects. In the eminent domain context, a third party authorized to exercise a government's condemnation power initiates the action by making a condemnation filing in court. *See, e.g.,* 15 U.S.C. §717f(h). If the taking is valid, the court enters three judgments through the life of the lawsuit: an initial judgment of possession, a final judgment transferring title, and a just compensation award. *E.g., id.* Analogously, a Trails Act proceeding is initiated by two parties working together to exercise the federal government's condemnation power: the railroad and the sponsor. After the railroad files a notice of exemption, the sponsor makes the condemnation filing—the petition for interim trail use. 49 C.F.R. § 1152.29(a)(1). While negotiations are ongoing, the NITU serves as the "initial judgment of immediate possession." *Caldwell v. United States*, 391 F.3d 1226, 1234 (Fed. Cir. 2004) (internal quotation marks omitted). If negotiations succeed, the *same* NITU acts as the STB's final judgment extending the stay of exemption "indefinitely for the duration of recreational trail use subject to the trail operator's fulfillment of its agreed-upon obligations." *Id.* at 1230. But even if negotiations fail, the analogy may still hold if multiple NITUs are issued and an ITUR agreement is ultimately reached. The only difference in such cases is that the STB's "judgment" consists of all the NITUs put together, rather than just one. *Barclay*, 443 F.3d at 1375 (multiple NITUs constitute a "single and continuous government action.").

Trail use proceedings do differ from third-party condemnation actions at the just compensation stage, in three ways. In eminent domain actions by third parties, the same court approves the condemnation and awards just compensation; property owners are party to the proceedings; and the third party that condemned the property also foots the bill. *See, e.g., Sabal Trail Transmission, LLC v. 18.27 Acres of Land in Levy Cnty.*, 59 F.4th 1158, 1161 (11th Cir. 2023). In Trails Act proceedings, the condemnation "court" is the STB while just compensation is awarded by this Court under the Tucker Act; the STB can and usually does proceed without property owners present;[6] and

---

[5]     The joint notice must once again contain "a map depicting, and an accurate description of, the involved right-of-way or portion thereof." 49 C.F.R. §1152.29(h).

[6]     The STB has "repeatedly considered . . . and declined to adopt" regulations requiring railroads or trail sponsors to directly notify adjacent landowners of the proceeding even *after* a NITU has been issued or an ITUR agreement reached. 84 Fed. Reg. 66,320, 66,324 (Dec. 4, 2019) (STB final rule amending Trails Act regulations). Compare this with regulations for other stakeholders, including

compensation is paid by the federal government, not the third parties who initiated the proceeding (the sponsor and the railroad).

### 3. Proceedings to alter the terms of a Trails Act conversion

The STB's procedures for altering the terms of an already-issued NITU are also relevant to this case. The agency recognizes two routes for modifying a NITU: "vacatur" and "clarification." The railroad and the sponsor may request vacatur (also known as modification, correction, or amendment) of the NITU in whole or in part. 49 C.F.R. § 1152.29(d)(2). When a NITU is vacated, ownership reverts to the railroad, allowing the railroad to "fully abandon the line segments" pursuant to the notice of exemption that had been stayed by operation of the NITU. *Kan. & Okla. R.R., Inc.— Aban. Exemption*, STB No. AB-853 (Sub-No. 1X), 2007 WL 3353205 at *1 (Nov. 9, 2007). Thus, vacatur returns the affected portion of the corridor to the status quo ex ante, and the federal government is liable, at best, for a temporary taking. *See Hardy v. United States*, 965 F.3d 1338, 1349–50 (Fed. Cir. 2020).

The sponsor may also file a petition for "clarification" of the NITU. The STB appears to use "clarification" as a legal term of art for (1) relieving the trail sponsor of its railbanking obligation upon a showing that the portion is not "necessary" for future rail reactivation, and yet (2) permitting the sponsor to control and even *sell* that portion for *non-trail, non-rail* uses. *See Mo. Pac. R.R.—Aban. Exemption*, STB No. AB-3 (Sub-No. 137X), 2021 WL 3235207 at *3–*4 (July 27, 2021); *id.* at *3 (collecting STB decisions). Thus, if the STB approves such a petition, the sponsor effectively owns an easement that is unqualified (that is, without the railbanking obligation and perhaps also without the trail-use limitation) over the relevant portion of the easement. This is similar to the state of affairs in the *post*-abandonment condition, except that the default owner of the unqualified easement is the sponsor, rather than the landowner.

As a practical matter, property owners may prefer a clarification over a vacatur, because they find it easier to negotiate with the sponsor than the railroad. Either way, however, they must rely on the sponsor or railroad to initiate the proceeding.

### B. Statement of Facts[7]

### 1. Factual background

*The A&Y Greenway*. Just north of the rail-trail at issue in this litigation lies the 7.4-mile Atlantic & Yadkin Greenway ("A&Y Greenway"). The City acquired the A&Y Greenway post-abandonment, by negotiating with property owners. These

---

private parties such as shippers and labor unions, on whom the railroad is required to serve its notice of exemption at the outset of the proceeding. 49 C.F.R. § 1152.20(a)(2)(i), (xii).

[7]    This section constitutes the Court's principal findings of fact under Rule 52(a) of the Rules of the United States Court of Federal Claims ("RCFC"). Other findings of fact and rulings on mixed questions of fact and law are set forth in the Discussion section of this opinion.

negotiations were successful in part because, as one Greensboro councilmember put it, "[t]he greenways were established to promote business." PX77j.  The City received some segments "at almost no cost thanks to negotiations with businesses and residences along the corridor."  U.S. Fed. Hwy. Admin., Ecusta Rail Trail Planning Study & Economic Impact Analysis 4-9 (2012).  Another portion, the southernmost 1-mile segment known as the "Battleground Rail Trail," was acquired from landowners at a cost of $1,694,752, or just $321 per foot.  *Id.*  Mr. Kotis was one of the property owners who participated in these land transactions.  PX338; Tr. 62:5–63:5.

The City also received an easement superior to Trails Act easements because it is unburdened by the railbanking obligation, making it easier to accommodate neighboring businesses, which simultaneously increases the City's tax base and reduces the cost of acquiring the trail.  For example, the City routed the trail around a parking lot owned by Mr. Kotis, and a "CVS," a "Total Wine," and a "Rice Toyota" owned by other property owners.  Tr. 55:20–56:12.

*The subject corridor.*  This case concerns the 3.1-mile Corridor immediately south of, and abutting, the Battleground Rail Trail.  Until 2014–15, Norfolk Southern provided rail services in the Corridor for the benefit of a single customer, Chandler Concrete/Piedmont, Inc.  PX204, 206.  When that customer moved elsewhere, leaving "no other known active or prospective rail tenants" for the rail service, PX204, the City sought to convert the Corridor into a greenway by first persuading Norfolk Southern to abandon the rail easement, and then acquiring the Corridor from landowners.  As Jim Westmoreland, then City Manager, explained in a letter to Mr. Kotis:

> [T]he City is not interested in rail-banking the corridor . . . . We are interested in [Norfolk Southern] corridor abandonment and then, the City acquiring the needed right of way from adjacent property owners.

PX 204.  Just as in the case of the A&Y Greenway, the City preferred a post-abandonment conversion because, in the absence of a railbanking obligation, it would have been free to work with "[Mr. Kotis]/other developers" to "enhanc[e] the economic and job creation benefits of the corridor."  PX204.  Seeing the project as a win-win, Mr. Kotis took on a leading role in selling the idea to other property owners, PX77j, and volunteered to design portions of the proposed greenway at his own expense, JX218; *see also* JX1447 80:1–17.  He has also financially supported "about 200" street art installations on and along the City's existing and planned greenways, including the subject Corridor.  Tr. 52:15–17; *see, e.g.*, JX14 at 20 fig.12.

However, under the STB's regulations implementing the Trails Act, the decision to abandon the Corridor was in the hands of Norfolk Southern, not the City.  Norfolk Southern let the City know that it would not abandon the Corridor without an ITUR agreement in hand.  JX1447 at 63:21–64:2.  At some point before June 2017, the City buckled and began to negotiate a railbanking agreement with Norfolk Southern.  JX106.  The negotiations took place behind closed doors at the railroad's request.  *Id.*

Meanwhile, the City simultaneously kept working with Mr. Kotis to route the proposed greenway in such a way as to maximize the growth potential of downtown Greensboro. PX218.  Matters came to a head on June 14, 2018, when a City employee informed Mr. Kotis that "[w]hile we've not finished negotiations with [Norfolk Southern], the likely dispensation will be through the rail banking process which would allow for trail usage only—not roads, driveways, or parking."  PX218.  Mr. Kotis then raised "serious concerns" that the railbanking option would jeopardize "all our planned $150 million investment alon[g] the former railroad," PX218, and withdrew his support for the project.

*The abandonment exemption and trail use proceeding.*  The negotiations between the City and Norfolk Southern were ultimately successful.  On April 12, 2019, the City and Norfolk Southern entered into a purchase and sale agreement for the entire Corridor, with the "exact area of land to be purchased . . . to be determined by a survey" of the Corridor.[8]  JX79.  The agreement did not provide for any adjustments to the boundaries of the Corridor—an option contemplated by STB's regulations, *see* 49 C.F.R. § 1152.29(a)(1)—and instead provided that the trail "would just go straight down the middle," Tr. 76:21–22.  The agreement further required the City to: (1) pay the railroad $8,500,000 for the 3.1-mile corridor (approximately $519 per foot as compared to the $312 per foot paid to property owners for the Battleground Rail Trail); and (2) assume railbanking obligations as well as responsibility for all costs associated with the Corridor, including management, liability, and tax burdens, as required by 49 C.F.R. § 1152.29(a)(2).  JX79.  It also committed the parties to the sale only if, after the railroad had filed a notice of exemption and the City had petitioned for trail use, the STB "imposes a valid [NITU] for . . . interim trail use" on the Corridor.  *Id.*

On August 26, 2019, Norfolk Southern filed a Notice of Exemption with the STB, requesting permission to abandon an ROW whose "width ranges from 50 feet to 200 feet along the main track centerline."  Notice of Exemption at 31, *Norfolk Southern R.R. Co.—Aban. Exemption* [hereinafter *Exemption Proceeding*], STB No. AB-290 (Sub-No. 404X) (filed on Aug. 26, 2019).  The railroad also stated that "not abandon[ing] the Line and retain[ing] the track in place . . . is not satisfactory," because the railroad "would continue to incur opportunity and other holding costs that would need to be covered by non-existent shippers."  *Id.* at 32.  The exemption went into effect on September 13, 2019, authorizing the railroad to abandon the line on or before September 13, 2020, after which the permit would expire automatically.  Board Decision at 3, *Exemption Proceeding* (issued on Sep. 13, 2019).

On the same day, the City filed its petition for interim trail use and railbanking. Petition for Interim Trail Use, *Exemption Proceeding* (filed on Sep. 13, 2019).  The City attached to the petition a map that, consistent with the description in the railroad's notice of exemption, depicted a corridor varying between 50 feet and 200 feet in width. *Id.* at 4 Ex. A.  The City also assumed "full responsibility" for all management costs,

---

[8]      Norfolk Southern also agreed to assign to the City its rights under eight lease agreements with neighboring landowners.  JX79.

liability, and tax associated with the Corridor, and acknowledged its railbanking obligation. *Id.* at 2.

On September 20, 2019, the STB's Office of Environmental Analysis filed its environmental review report, concluding that an environmental impact statement is unnecessary. Environmental Assessment, *Exemption Proceeding* (filed on Sep. 20, 2019). The report was prepared on the assumption that the Corridor had a "width rang[ing] from 50 to 200 feet along [i.e., counting both sides of] the main track centerline." *Id.* at 1, 3.

On October 11, 2019, the STB issued the NITU, giving the City and Norfolk Southern 180 days to negotiate an ITUR agreement for "the Line" and "the right-of-way," referring to the descriptions in the railroad's application and the City's petition, respectively. JX83 at 1–2. The STB also stated that if the parties failed to reach an agreement within 180 days, the Norfolk Southern would once again be permitted to abandon the rail easement. *Id.* at 3.

On November 8, 2019, the City and Norfolk Southern jointly notified the STB that they have reached an ITUR agreement covering the "entirety" of the line that "is the subject of the above-captioned abandonment proceeding." Notice of Consummation, *Exemption Proceeding* (filed on Nov. 8, 2019). On the same day, the City and Norfolk Southern executed the nonwarranty deed ("the Deed") contemplated in the purchase and sale agreement, quitclaiming the railroad's interest in the Corridor unto the City subject to the requirements of the Railbanking Provision. JX4. The deed provided a legal description of the Corridor and a detailed map (the "Survey Map") that, consistent with the railroad's and the City's representations and the STB's internal environmental assessment, depicted an ROW that was up to 200 feet wide (that is, up to 100 feet either side of the centerline). JX4 Exs. A & B.

### 2. The Subject Properties

The Kotis Entities together own thirteen parcels that abut and underlie the Corridor. These properties are located all along the Corridor in clusters, with a combined total frontage of approximately one mile, or one-third of the length of the Corridor. Tr. 48:4–8. From north to south, the properties are as described below. Unless noted otherwise, the facts are derived from the parties' joint stipulations. *See* Jt. Stips. Fact Tr. at 2–5, ECF No. 117.

### a. "Shops on the Greenway"

**2414 Battleground Avenue ("Texas Roadhouse property").** Located at the northern end of the Corridor, this parcel was owned by Kotis Holdings, LLC on October 11, 2019, the date of the taking. The parcel is 227,383 square feet ("SF") or approximately 5.22 acres in size, and it is zoned as "Conditional District, Commercial – Medium." JX6 at 3, 16–17, 22. Mr. Kotis purchased the property in 2010 to build a hub of shops and restaurants, which would have been known as "Shops on the Greenway." Tr.

102:13–14; 894:1.  As of 2019, Mr. Kotis had built two commercial buildings fronting Battleground Avenue: a 7,393 SF building that currently houses a Texas Roadhouse steakhouse, and a 5,952 SF building being used as a Mattress Warehouse store.  JX6 at 3, 16; DX 232; DX 235.  The remainder of the site, which consists of a cell tower, 92,000 SF of paved parking, and currently vacant land, JX6 at 18; DX 237, is suitable for high-end commercial development.  As a result of the taking, 51,849 SF of the land is encumbered by the ITUR easement.  JX117 at 1.  The highest and best use of the property absent the taking is Class A Retail Space with excess land available for development.  The highest and best use of the property after the taking is also Class A Retail Space but with surplus land.

### b.  "Westover Galleries"

**1430 Westover Terrace ("Core Life property").**  This parcel was owned by Kotis Holdings, LLC, on October 11, 2019.  Somewhat uniquely, the property has frontage on three streets—Westover Terrace to the west, Green Valley Road to the north, and Battleground Avenue to the east.  JX38 at 1.  The parcel is 28,445 SF or approximately 0.65 acres in size, and it is zoned as "Commercial – Medium."  JX7 at 3, 21.  Mr. Kotis purchased the property in 2007 because it was located on a "premier corner" with high visibility.  Tr. 122:11–22.  He "tore . . . down" an "IHOP" building located on the property, and built in its place a 4,000-SF commercial space in the northeast corner of the parcel, abutting Battleground Avenue and Green Valley Road.  Tr. 123:3; JX7 at 3, 21.  The building currently houses Core Life, a high-end eatery.  JX7 at 25.  The remainder of the property consists of 690 SF of outdoor canopy dining space, and 16,000 SF of paved parking connected to the parking lot in the neighboring parcel, 1424 Westover Terrace (which is discussed next).  JX7 at 24.  As a result of the taking, nearly half of the parcel—13,800 SF—is encumbered by the ITUR easement.  JX38 at 1.  The Core Life building is located almost entirely in the encumbered portion.  JX38 at 1; JX7 at 48 fig. 20, 49.  The *un*encumbered remainder has no access to Battleground Avenue or to the parking lot on 1424 Westover Terrace.  JX7 at 47 fig.18.  The highest and best use of the property absent the taking is Class "A" retail or office space.  As a result of the taking, the highest and best use is as a vacant commercial site.

**1424 Westover Terrace ("Brixx Pizza property").**  This parcel was owned by Westover Terrace II, LLC as of October 11, 2019.  It fronts Westover Terrace; is 32,234 SF or approximately 0.74 acres in size; and is zoned as "Commercial - Medium."  JX9 at 3, 15, 19.  Mr. Kotis purchased the parcel "in the mid-90s" and later built a multi-tenant commercial space with 11,529 SF of leasable space.  Tr. 128:18; JX9 at 17.  The portion of the building fronting Westover Terrace currently houses a Brixx Pizza restaurant.  JX9 at 32; DX207.  The rear of the building contains a two-story, multi-tenant retail/office space which is largely vacant pending the outcome of this litigation.  JX9 at 17; *see also* DX218.  In addition to the commercial space, the property contains 16,400 SF of paved parking which connects to parking spaces in the adjoining parcels.  JX9 at 17.  As a result of the taking, nearly half of the parcel—16,100 SF—is burdened by the ITUR easement.  JX40 at 1.  The encumbered portion runs through the retail/office space at the rear of the building and the parking space, and also cuts off the

access points to neighboring parking spaces. JX40 at1; JX9 at 43 fig.20. The highest and best use of the property absent the taking is Class "A" retail/office space. After the taking, the highest and best use is as a vacant commercial site.

**1420 Westover Terrace ("Chipotle property").**  This parcel was owned by Westover Terrace II, LLC as of October 11, 2019. It fronts Westover Terrace, and the parcel size is 27,400 SF or approximately 0.629 acres. JX12 at 3, 15. The parcel is zoned as "Commercial – Medium." JX12 at 15. Mr. Kotis acquired the property in 1989, and in 1997 the parcel was repurposed from a warehouse to a multi-tenant retail building. JX12 at 17. The parcel contains a multi-tenant retail/office building with 11,319 SF of leasable space. JX12 at 3, 15. The space is fully occupied and houses tenants such as a Chipotle restaurant, a Cherry Pit Café, and a "medspa" called Ideal Image. Tr. 132:1–8; JX12 at 17; DX190; DX209; DX210; DX218; DX220; DX224. The remainder of the site includes 9,240 SF of paved parking and an 840-SF covered walkway. JX12 at 17. The ITUR easement burdens 13,700 SF of the parcel. JX43 at 1. It cuts through the building and parking space, and encumbers access points to parking spaces in the neighboring parcels. JX43 at 1; JX12 at 44 fig.19. The highest and best use of the site absent the taking is Class "A" retail/office space. As a result of the taking, the highest and best use is as a vacant commercial site.

**1410 Westover Terrace ("Orange Theory property").**  This parcel was owned by Westover Terrace II, LLC on October 11, 2019. The parcel fronts Westover Terrace as well; its size is 56,129 SF or approximately 1.29 acres; and it is zoned as "Conditional District, Commercial – Medium." JX11 at 3, 15. This parcel was also converted from a warehouse to a multi-tenant retail building in 1997, and Mr. Kotis purchased the property in 2005. JX11 at 17–18. The parcel contains a 22,256 SF multi-tenant retail building, 31,446 SF of paved parking including an access road to neighboring properties, and a covered walkway. JX11 at 3, 15, 17. The retail building is fully occupied. JX11 at 17. Current tenants include Great Outdoor Provisions, an outdoor sports store; and Orange Theory, a fitness club. Tr. 142:1–4; DX229. The ITUR easement burdens 28,000 SF of the parcel, encompassing the access road to 1420 Westover Terrace and cutting through the retail building and approximately half of the parking space for retail customers. JX42 at 1; JX11 at 43 fig.19. The highest and best use of the site absent the taking is Class "A" retail space. As a result of the taking, the highest and best use is now as a vacant commercial site.

**1310 Westover Terrace ("Publix property").**  This parcel was owned by Westover Terrace II, LLC as of October 11, 2019. The parcel is 180,388 SF or approximately 4.14 acres in size, and it is zoned as "Conditional District, Commercial – Medium." JX10 at 3, 14, 20. The property was assembled by Mr. Kotis in multiple stages over an extended period of time. JX12 at 18. The site is currently improved with 29,016 SF of commercial space, and 122,902 SF of paved parking including an access road toward the rear of the property. JX10 at 14, 17. At the time of the taking, the property hosted restaurants named World of Beer, Osteria and Chicken Salad Chick, and was the site (along with 1500 Mill Street, discussed below) of a planned high-end, 45,600-SF grocery supermarket, Publix, for which the plaintiff owner had executed a lease before

the date of the taking.  Tr. 117:1–6; DX184; DX192; DX213; DX217; PX308.  The ITUR agreement burdens 63,330 SF of the parcel, and cuts through parking space, the existing commercial buildings, as well as the footprint of the planned Publix market.[9] JX41 at 1; JX10 at 42; PX294.  The highest and best use of the site absent the taking is Class "A" retail space.  As a result of the taking, the highest and best use is now as vacant land suitable for commercial development.

**1500 Mill Street ("Saffron property").**  This parcel was owned by Westover Terrace II, LLC on October 11, 2019.  The parcel fronts Mill Street, which connects Westover Terrace and Battleground Avenue on the south side of the Westover Gallery of Shops. The parcel is 62,683 SF or approximately 1.439 acres in size, and is zoned as "Conditional District, Commercial – Medium."  JX13 at 3, 15.  The site is improved with an 18,400-SF multi-tenant retail development which hosts, among other tenants, two restaurants, Taste of Thai and Saffron, and a dance studio named Fred Astaire.  Tr. 894:14–15; JX13 at 3, 15; DX191; DX204; DX206; DX221.  The remainder of the property contains 29,000 SF of paved parking and a 640-SF covered mall area.  JX13 at 17.  A portion of the parcel was also part of the footprint of the planned Publix shopping center.  PX308 at 55.  The ITUR easement burdens 29,989 SF of the parcel, cutting through the commercial space and the footprint of the planned Publix store. JX44 at 1.  The highest and best use of the property absent the taking is Class B+ retail or office space.  As a result of the taking, the highest and best use of the property is as a vacant commercial site.

**1715 Battleground Avenue ("Take 5 Oil property").**  This parcel was owned by Kotis Associates, LLC on October 11, 2019.  The parcel size is a triangular tract between the properties that comprise the Westover Gallery of Shops and Battleground Avenue.  It is 34,458 SF, or approximately 0.79 acres, in area, and it is zoned as "Commercial – Medium."  JX5 at 3, 18.  The tip of the triangular parcel is left vacant for construction of an access road from Battleground Avenue, a major thoroughfare, to the Westover Gallery of Shops.  Tr. 119:17–20.  The base of the triangle houses 1,586 SF of commercial space in the form an automobile oil-change service station, Take 5 Oil. JX5 at 18; DX233.  The parcel also contains 15,000 SF of paved parking and a two-sided billboard valued at $60,000 according to county records.  JX5 at 18 & n.9, 21. The ITUR easement burdens 28,685 SF of the parcel—that is, all but a sliver at the base of the triangle—including most of the Take 5 Oil facility and paved parking, the entirety of the billboard, and the potential access road to the Westover Gallery of Shops.  JX36 at 1; JX5 at 44 fig.20.  The highest and best use of the site absent the taking is its existing use, specialty street-front retail and billboard use.  As a result of the taking, the property owner no longer has the legal right to put the parcel to any productive use.

### c.  Midtown Properties

---

[9]        During the pendency of the litigation, the City petitioned the STB to lift the railbanking obligation from a small portion of the parcel.  The petition is discussed later in the opinion.

**1305 Battleground Avenue ("Red Cinemas property").**  This property was owned by Westover Terrace II, LLC on October 11, 2019.  The parcel size is 251,410 SF (approximately 5.77 acres), and it is zoned as "Conditional District, Commercial – Medium."  JX14 at 3, 16.  The site, which fronts Battleground Avenue just south of another arterial road, Wendover Avenue, is currently used for a 44,956 SF multiplex theater, Red Cinemas.  JX14 at 16; DX181.  The parcel is also improved with a 33,216-SF landscaped parking lot.  JX14 at 19.  Plaintiff purchased the property in 2014 after which the existing property was "completely gutted and redone" to build the existing multiplex.  Tr. 573:1.  The back wall of the theater, which would face the trail if allowed to remain, features commissioned street art by various famous artists.  JX14 at 19, 20 fig.12.  The ITUR easement encumbers 98,259 SF of the parcel, which overlaps with the entire back wall of the cinema complex.  JX45 at 1; JX14 at 40 fig.18.  As a result of the building's "tilt-up masonry structure, with a very specific design as a multi-plex, the back wall cannot be removed without demolishing the entire structure."  JX14 at 19.[10]  The highest and best use of the site absent the taking is its existing use: as a multiplex theater.  As a result of the taking, the highest and best use is as a vacant commercial development site.

**1211 Battleground Avenue ("Marshall Free House property").**  This property was owned by Westover Terrace II, LLC on October 11, 2019.  The parcel is 65,340 SF (approximately 1.5 acres) in size, and it is zoned as "Conditional District, Commercial – Medium."  JX17 at 3, 15.  The site fronts Battleground Avenue, and it consists of 6,692 SF of commercial space and eighty-seven parking spaces.  JX17 at 15, 17.  The building previously housed a restaurant, Marshall Free House, but it is vacant pending the outcome of this litigation.  JX17 at 18.  The parcel also shares a two-lane access road to Battleground Avenue with the neighboring parcel, 1315 Battleground Avenue.  JX17 at 42 fig.20.  The ITUR easement encumbers 13,089 SF of the parcel, which includes access to the common road to Battleground Avenue, and several parking spots.  JX118 at 1; JX17 at 42 fig.20.  The highest and best use of the site absent the taking is Class "A" retail space.  As a result of the taking, the highest and best use is a Class "B" retail or commercial space.

**1209 Battleground Avenue ("Burger Warfare property").**  This property was owned by Westover Terrace II, LLC on October 11, 2019.  The parcel is 54,886 SF (approximately 1.26 acres) in size, and it is zoned as "Conditional District, Commercial – Medium."  JX15 at 3, 15.  The site fronts Battleground Avenue and it contains 7,708 SF of multi-tenant retail space, as well as sixty-two lined parking spaces.  JX15 at 15, 18.  Current tenants include a restaurant, Burger Warfare; a wine shop; and a salon.  DX 1643–44.  The ITUR easement encumbers 12,250 SF of the parcel, approximately half of which is vacant land and the other half parking spaces.  JX119 at 1; JX15 at 43 fig.18.  The highest and best use of the site absent the taking is Class "A" retail space.  As a result of the taking, the highest and best use is a Class "B" retail space.

---

[10]    Prior to the taking, the railroad attempted to exercise its right to have the structure demolished. JX81; PX197–98.

**1201 Battleground Avenue ("Midtown Financial property").**  This property was owned by Westover Terrace II, LLC on October 11, 2019.  The parcel is triangular in shape, 31,799 SF (approximately 0.73 acres) in size, and zoned as "Conditional District, Commercial – Medium."  JX16 at 3, 15.  The site fronts Battleground Avenue and it contains a two-story, 12,080-SF office building with a "unique shape," as well as forty-two lined parking spaces.  Tr. 446:13; JX16 at 18.  Current tenants are Carter Bank on the ground floor and Midtown Financial Advisors on the second floor.  JX16 at 18; DX185–86.  The ITUR easement encumbers 14,750 SF of the parcel, which eliminates most of the available parking, and leaves just eighteen feet of space between the trail corridor and the building on the site.  JX120 at 1; JX16 at 42 & fig.17.  The reduction in parking makes it more difficult to comply with the City's ordinance requiring a minimum of thirty-one parking spaces for the on-site building, given its size of 12,080 SF.  *See* Greensboro, N.C., Land Devp. Ord. § 30-11-5 (requiring, as relevant here, one parking spot per 400 SF of office space).  The highest and best use of the site absent the taking is Class "A" office space.  As a result of the taking, the highest and best use is a Class "B" office space.

### d.  The Spring Street Parcel

**601–623 Spring Street ("Spring Street property").**  This parcel was owned by Kotis Holdings, LLC on October 11, 2019.  The parcel is roughly triangular in shape, and it is bounded by the railbanked easement to the northeast, an *active* rail line to the south, and the Downtown Greenway trail and an elevated highway to the west.  JX39 at 1.  An abandoned radio transmission tower is located roughly at the center of the lot.  JX8 at 20.  Although the total size of the property is 114,548 SF (2.629 acres), an easement for the active rail line—which is *not* the subject of this litigation—renders 47,200 SF of the property unusable with or without the railbanked easement.  JX8 at 3, 23–24.  Thus, the property contains 67,348 SF of developable land.  JX8 at 24.  The parcel is located at the edge of downtown Greensboro in close proximity to the University of North Carolina at Greensboro, and it is zoned as "Central Business," which earmarks properties "in the central core of the city . . . [for] high-intensity, compact urban development."  Greensboro, N.C., Land Devp. Ord. § 30-6-5.5.  The property may be used for mixed and multiple uses, "including office, retail, service, institutional, and high-density residential developments . . . [that] may be located in the same building."  *Id.*  The property is exempt from building height restrictions and off-street parking requirements.  *Id.* §§ 30-7-5.1, 30-11-4.1.  The ITUR easement encumbers 42,755 SF of the parcel, and it blocks the only vehicular access point, thus foreclosing all productive use of the property.  JX39 at 1; JX8 at 10 fig.3.  The highest and best of the property absent the taking is as a vacant development parcel suitable for a mixed-use high-rise development anchored by student housing or a hotel.  As a result of the taking, the parcel cannot be put to any productive use.

### 3.  Events after the Trails Act conversion was complete.

As the descriptions above indicate, many parcels contain permanent structures located partially or wholly within the footprint of the Corridor.  After the ITUR easement went into effect in November 2019, the legal status of these structures—the

parties call them "encroachments" but this opinion with refer to them as "overlying structures"[11]—was thrown into uncertainty.  Mr. Kotis asked the City to clarify whether it had the right to eject the existing overlying structures and prevent new overlying structures from being built; and, if so, whether it intended to exercise that right. According to City Attorney Charles Watts, the conversation focused primarily, though not exclusively, on the planned Publix development, and specifically, the planned loading dock at the back of the development, which would extend into the Corridor. JX1446 at 41:8–19.  The City took a cooperative stance and sought to "help Mr. Kotis figure out how to encroach on the right of way."  JX1446 at 29:2–4.  Nonetheless, it ultimately concluded, after engaging an outside attorney who practices before the STB, that:

> if we facilitate or allow encroachment on the right of way, we could potentially lose the *entire* Greenway . . . [b]ecause the [STB] has taken that ability away from us and we're an agent of them and we don't have discretion to grant encroachments on the right of way.

JX1446 at 43:11–20; 49:6–11 (emphasis added).  Ultimately, the City settled on a policy of enforcing its right "not [to] allow any new construction" in the Corridor; and retaining, but not enforcing, its right to eject the pre-existing overlying structures. JX1448 at 242:12–14 (Interim Deputy City Manager Christian Wilson confirming that the City "could" remove existing overlying structures "in the future"); JX1448 at 237:5–11 (Wilson stating that the City "hasn't given any assurances that [existing overlying structures] won't be removed," nor would it be "appropriate for the City to give those assurances").

Once it became clear that the City would not act without the STB's approval, Mr. Kotis initiated a dialogue with the federal government by reaching out to Senator Richard Burr, who in turn reached out to the STB.  Tr. 90:21–91:7.  Senator Burr later relayed the STB's response to Mr. Kotis, in which the STB stated that "rather than the trail sponsor authorizing the fringe encroachments by adjacent landowners, the better practice might be to come to the board . . . to shrink the rail bed corridor."  JX155. Furthermore, Mr. Kotis lacked standing to initiate such a proceeding: only the City could seek a decision "clarifying" that the portion "is no longer part of the NITU[]."

---

[11]    Although recent opinions of this Court have adopted the term "encroachment," *see, e.g.*, *Agapion v. United States*, 167 Fed. Cl. 761, 770 (2023); *Cheshire Hunt, Inc. v. United States*, 158 Fed. Cl. 101, 102 (2022), the Court now believes that it is misleading.  "Encroachment" carries with it an implication of illegality.  *See Encroachment*, Black's Law Dictionary (12th ed. 2024) ("An interference with or intrusion onto another's property.").  However, in the "before" or "but-for" condition where landowners own their respective parcels in unfettered fee simples, *see* § III.B.1.a, *infra*, it is undisputed that the structures would be legal.  And, counterintuitively, *the defendant* maintains that the structures are and have always been legal.  *See* § III.B.1.b.ii, *infra* (describing the government's argument that the structures were legal, and continue to be legal, because they do not conflict with rail use, trail use, or railbanking).  Given that the legality *vel non* of these structures prior to the issuance of the NITU plays at best a minor role in the legal analysis—and that both parties agree that the structures are legal in at least some scenarios—the value-neutral term "overlying structure" is less distracting and more appropriate.

JX154 at 1.  To prevail, the City would have to "demonstrate" to the STB that the portion at issue "is not needed to reactivate rail service."  JX154 at 1.

Taking the STB's cue, on December 7, 2022—while this litigation was ongoing and a week before trial—the City filed a clarification petition with the STB.  Petition for Clarification, *Exemption Proceeding* (filed on Dec. 7, 2022) [PX343].  The petition asked the STB to "clarify" that the width of the Corridor along one of the thirteen subject parcels, the Publix property, is "at most 50 feet in connection with a land sale to Kotis Properties . . . to develop an important grocery store."  *Id.* at 1.  The City asserted that the "remaining [50-feet-wide] right-of-way that would continue to be subject to the NITU is sufficient to permit the future reestablishment of rail service," and asked the STB to lift the railbanking obligation on the tract outside the 50-feet-wide area so that the City may "convey[]" or "sell" the tract to Kotis Properties.  *Id.* at 2, 7–9.[12]  Norfolk Southern opposed the petition, arguing that (1) the STB should require the City to file an adverse abandonment application instead of a clarification petition; and (2) the portion could be needed for future rail use as a site for "a future storage yard, siding, or communication tower."  Reply of Norfolk Southern, *Exemption Proceeding* (filed on Dec. 27, 2022).  The STB ruled that a petition for clarification is the appropriate procedural vehicle, and exercised jurisdiction over the City's petition to narrow the railbanked portion of the Corridor from 200 feet to 50 feet, while specifically noting that the United States' position before this Court is that "the easement is not 200 feet [wide]."  Board Decision at 2 & n.3, *Exemption Proceeding* (issued on June 28, 2023).  Several months later, the railroad dropped its objections, and the STB granted the City's petition on the merits.  Board Decision at 1, *Exemption Proceeding* (issued on Jan. 4, 2024) [hereinafter Clarification Decision].  That last decision is the subject of defendant's motion to reopen the trial record, see Section II, *infra*.

## II.    Procedural History

Plaintiffs filed their complaint on July 30, 2020.  Compl., ECF No. 1.  On December 16, 2020, the parties stipulated to the following:  Plaintiffs owned title to the subject properties at the time of the taking; the railroad held an easement over the properties for "railroad purposes" only; and the subject properties underlie and abut the ROW described in the NITU.  Jt. Title Stips. at 1, ECF No. 10.  In a bid to settle the case, the parties jointly engaged an appraiser, Mr. Thomas Taylor, who completed his report sometime prior to August 16, 2021.  Jt. Status Rep. at 1, ECF No. 24.  On November 9, 2021, plaintiffs informed the Court that the parties had failed to reach a settlement.  Pls.' Status Rep. at 1, ECF No. 38.

---

[12]      At trial, Mr. Kotis took issue with the City's effort to "sell me my own land to eliminate the easement."  Tr. 202:3–6.  He further noted that the City's proposed narrowing was not sufficient to allow the Publix project to go forward because, while it would remove the *footprint* of the loading dock at the rear of the planned Publix development from the Corridor, the service road that leads to the loading dock would still overlie the narrowed Corridor.  Tr. 864:11–20.

*Defendant's motion for summary judgment.*  On August 22, 2022, defendant filed a motion for summary judgment arguing that the evidence to be presented at trial supports, at best, "a nominal award" that, according to the defendant, "this Court lacks jurisdiction to provide."  Def.'s Mot. Summ. J. at 9 [hereinafter Def.'s MSJ], ECF No. 88.  On September 1, 2022, the Court issued an order that, among other things, stayed the plaintiffs' Response.  Order at 1, ECF No. 99.

*Motions in limine.*  On August 31, 2022, the parties filed three motions in limine to exclude the testimonies and declarations of several potential witnesses.  First, plaintiffs moved to exclude the testimony and declarations from representatives of Norfolk Southern Railway, including the railway's Director of Real Estate, Ms. Kristi D. Blair.  Pls.' Mot. in Limine Excl. Test. of Norfolk S. R.R. at 1, 5, ECF No. 96.  Second, defendant moved to exclude the testimony of plaintiffs' appraiser, Dr. John A. Kilpatrick.   Def.'s Motion in Limine Excl. Test. of John A. Kilpatrick at 1, ECF No. 97.  Lastly, plaintiffs sought to exclude the testimony of defendant's rebuttal witness, Mr. Stephen Roach.  Pls.' Mot. in Limine Excl. Test. of Stephen Roach at 2, ECF No. 98.

On October 6, 2022, the Court *denied* plaintiffs' and defendant's motions to exclude the testimony of Mr. Roach and Dr. Kilpatrick, respectively, Order at 1, ECF No. 122, but *granted* plaintiffs' motion to exclude the testimony and declarations of Norfolk Southern representatives, including Ms. Blair, Order at 1, ECF No. 123.  Defendant submitted an offer of proof to preserve its claim of error as to the granted motion.  *See* Def.'s Offer of Proof, ECF No. 150.  In that filing, defendant stated that Blair's testimony would have established that Norfolk Southern would not have abandoned its easement—and the Corridor would therefore not have reverted to landowners—without an ITUR agreement in hand.  *Id.* at 2.  Defendant argued that this testimony is relevant because it tends to show that the "proper 'before' condition" of the properties for calculating just compensation is fee title subject to the railroad easement (as opposed to fee title free and clear of any easement).  *Id.* at 1; *see also* Def.'s Pre-Tr. Mem. at 11, ECF No. 90.

*Plaintiffs' motion for partial summary judgment.*  Also pending before the Court is plaintiffs' motion for partial summary judgment as to the applicable interest rate, filed on March 6, 2023.  *See* Pls.' Mot. for Partial Summ. J., ECF No. 173.  Plaintiffs argue that post-taking interest on the just compensation award should be based on Moody's Composite Index of Yields on Aaa Long Term Corporate Bonds ("Moody's Rate"), and, further, that the interest should be compounded.  *Id.* at 1.  Defendant filed a response on April 19, 2023, arguing that the Court should apply the One-Year Treasury Bond rate, which is the "rate that would apply in a direct condemnation," compounded annually.  Def.'s Resp. Pls.' Mot. Partial Summ. J.  at 2, ECF No. 179.  Plaintiffs filed their reply on April 26, 2023.  *See* Pls.' Reply Supp. Mot. Partial Summ. J., ECF No. 180.

*Trial.*  On December 13, 2022, the Court conducted a site inspection of the properties, and the valuation trial commenced on December 14, 2022, in Greensboro, North Carolina.  On December 14 and 15, plaintiffs presented a portion of their case-in-chief.  The remainder of the trial took place via live video conferencing on the following dates

in 2023: January 11 and 12, and February 22.  The parties filed post-trial briefs on February 28, 2023.  *See* Def.'s Post-Tr. Br., ECF No. 171; Pls.' Post-Tr. Br., ECF No. 172.

*Defendant's motion to reopen the trial record.*  On January 9, 2024, defendant moved to reopen the case for the purpose of considering new evidence.  Def.'s Mot. Reopen Case, ECF No. 188.  The evidence proposed for introduction was the STB's decision approving the City's "clarification" petition lifting the railbanking obligation from a portion of the Corridor abutting the Publix property.  *Id.* at 1; *see* Clarification Decision, *Exemption Proceeding*.  On January 23, 2024, plaintiffs filed their response. Pls.' Resp. Def.'s Mot. Reopen Case, ECF No. 192.  Defendant replied on February 20, 2024.  Def.'s Reply Supp. Mot. Reopen Case, ECF No. 195.  On April 2, 2024, the Court denied defendant's motion orally, with a written explanation to follow in this opinion.

## III.    Overview of Trial Testimony

Several witnesses testified during the valuation trial.  For the plaintiffs, the witnesses were Mr. Kotis in his capacity as the majority owner and designated representative of all three plaintiff entities; and Dr. John A. Kilpatrick, an expert appraiser who provided opinions of value.  The defendant called one witness: Mr. Stephen D. Roach, a real estate appraiser and consultant.  Mr. Roach did not offer opinions of value.  Instead, his testimony focused on rebutting Dr. Kilpatrick's methods, assumptions, and conclusions.  In addition, the parties stipulated to the admission of prior testimony and declarations of several City officials, including Mr. Charles Watts, then-City Attorney; and Mr. Christian Wilson, then-Interim Deputy City Manager.

### A.  Mr. Kotis's Testimony

In testimony that lasted two days, Mr. Kotis described the unique features of the thirteen parcels at issue in this litigation, as well as his interactions with the City, the STB, Norfolk Southern, and state and federal employees before, during, and after the Trails Act conversion.  Tr. 38–339.  He testified that pre-existing development on the properties significantly overlaps with the Corridor, and that removal would impact "all of [the Kotis Entities'] planned . . . $150 million investment . . . along the former railroad corridor." Tr. 78:12–15.[13]  He also outlined his ultimately unsuccessful efforts to persuade the STB and the City to narrow the corridor to remove any cloud on all pre-existing and planned overlying structures, or alternatively, to obtain assurances from the City that it would not seek to remove the existing overlying structures.  *E.g.*, Tr. 95–96.

### B.  The City Officials' Prior Testimony and Declarations

_____

[13]    Mr. Kotis is not an expert appraiser, and the Court heard his valuation testimony only for the purpose of understanding his investment-backed expectations, and his dealings with the City, the STB, and the railroad.

Mr. Wilson clarified the City's position on existing and new overlying structures in the easement corridor.  Mr. Wilson testified that the City believes that its ITUR easement extends up to 100 feet on either side of the existing rail line (up to 200 feet in total), and that the City's policy is to prohibit any new construction in that corridor. JX103; JX1448.  He confirmed that the City has not provided, and does not intend to provide, any formal assurances to plaintiffs and prospective purchasers that existing overlying structures would be allowed to remain, or new development permitted. JX103.

Mr. Watts testified, among other things, that the City has both the right and the obligation (as the STB's agent) to prevent new construction within the Corridor. JX1446.

### C. Dr. Kilpatrick's Testimony

Dr. Kilpatrick, plaintiffs' expert, provided the only valuation testimony in this case.  He prepared an appraisal report for each property, JX5–17; PX82 (errata amending reports), assuming that plaintiffs' title to the subject properties would be free of any easement in the "but-for" or "before-taking" condition, but servient to the Trails Act easement on the Corridor depicted in the Survey Map in the "after-taking" condition.  For the exact location and extent of the Corridor, Dr. Kilpatrick relied on maps and measurements prepared by Straup Solutions.  *See* JX36–48.

Turning to valuation, Dr. Kilpatrick classified the subject properties as "Class A" properties—that is, properties that are more attractive to prospective purchasers.  He estimated the fair market value of subject properties by combining the cost approach, income approach, and sales comparison approach, and concluded that plaintiffs are entitled to $44,744,774 in just compensation, of which $2,103,034 reflects severance damages.  He also assumed that a ten-foot "privacy wall" between the remainder of the subject properties and the Corridor would cure the harm to the severed remainders of the properties, and then used the estimated $2,103,034 in construction costs as a proxy for severance damages.

| | Before Value | After Value | Severance | Just Compensation |
|---|---|---|---|---|
| Kotis Holdings, LLC | | | | |
| 2414 Battleground Avenue | $8,779,171 | $7,292,091 | $288,776 | $1,775,857 |
| 1430 Westover Terrace | $2,118,692 | $507,134 | $73,121 | $1,684,679 |
| 601–623 Spring Street | $1,623,777 | $0 | $0 | $1,623,777 |
| Westover Terrace II, LLC | | | | |
| 1424 Westover Terrace | $4,098,642 | $530,339 | $85,308 | $3,653,611 |
| 1420 Westover Terrace | $4,002,111 | $450,295 | $72,592 | $3,624,407 |
| 1410 Westover Terrace | $6,829,527 | $742,692 | $148,362 | $6,235,197 |
| 1310 Westover Terrace | $9,879,502 | $3,146,489 | $335,405 | $7,068,418 |

| 1500 Mill Street | $4,753,314 | $768,315 | $169,027 | $4,154,026 |
|---|---|---|---|---|
| 1305 Battleground Avenue | $12,741,309 | $3,874,590 | $538,343 | $9,405,061 |
| 1211 Battleground Avenue | $3,219,162 | $2,327,321 | $105,973 | $997,815 |
| 1209 Battleground Avenue | $3,760,250 | $2,782,326 | $129,817 | $1,107,741 |
| 1201 Battleground Avenue | $3,303,326 | $1,116,099 | $156,310 | $2,343,537 |
| Kotis Associates, LLC | | | | |
| 1715 Battleground Avenue | $1,070,648 | $0 | $0 | $1,070,648 |
| Total | $66,179,431 | $23,537,691 | $2,103,034 | $44,744,774 |

Pls.' Post-Tr. Br. at 11–12; PX82.

### D. Mr. Stephen Roach's Testimony

Mr. Roach submitted a consolidated rebuttal to Dr. Kilpatrick's opinions of value. DX44. He testified that Dr. Kilpatrick's analysis misunderstands the property rights being valued, departs from appraisal best practices, relies on inapt comparators, and reaches conclusions that are not credible as to each subject parcel. DX44 at 7–106.

## IV. Discussion

Just compensation is calculated in two steps. First, courts "determin[e] the scope of [the] compensable property interest [as a matter of] law." *Anderson v. United States*, 23 F.4th 1357, 1361 (Fed. Cir. 2022) (citation omitted). Second, they ascertain the "fair market value" of the interest itself, plus the "diminution in value of the owner's remaining property." *Childers v. United States*, 116 Fed. Cl. 486, 497 (2013) (citation omitted). Both steps require the court to compare the condition of the property "before" or "but for" the taking, with its condition "after" the taking, but in slightly different ways. In the first step, the focus is on the nature of the property interest transferred to the government: If the owner held a property interest in the but-for condition but not in the after condition, then the interest was taken. In the second step, the focus broadens to include not just the property taken, but also the remaining property: The fair market value for the taking of an easement is "the difference between the value of the [entire] property before and after the Government's easement was imposed." *McCann Holdings, Ltd. v. United States*, 111 Fed. Cl. 608, 614 (2013) (quoting *Otay Mesa Property, L.P., v. United States*, 670 F.3d 1358, 1364 (Fed. Cir. 2012)). In both steps, plaintiffs bear the burden of presenting "accurate factual and legal assertions" and "credible market evidence," *Agapion v. United States*, 167 Fed. Cl. 761, 774 (2023), to establish the quantum of compensation owed "with reasonable certainty," *Gadsden Indus. Park, LLC v. United States*, 956 F.3d 1362, 1371 (Fed. Cir. 2020) (internal quotation marks and alterations omitted).

In this case, the parties disagree about the scope of the property interest at stake both in the "before" or "but-for" condition, and in the "after" condition. Defendant also seeks to reopen the trial record so that it may account for the STB's clarification order. Finally, defendant argues that plaintiffs double-count severance damages, and in any event have failed to meet their burden of proving how much just compensation is due. The Court considers each question in turn.

### A. Scope of the Property Interest Taken

### 1. Summary of arguments and the Court's conclusions

The parties have stipulated to a taking, but they may as well not have. According to the Kotis Entities, in the "after" condition, the ITUR easement encumbering their properties is up to 100 feet wide on either side of the centerline as depicted in the Survey Map, and they have no legal right to maintain existing overlying structures or build new overlying structures within the Corridor. Pls.' Post-Tr. Br. at 1 n.3, 3–5. They also argue that this encumbrance is a taking, because Norfolk Southern would have abandoned the railroad ROW in the "before" or "but-for" condition, leaving them with unfettered fee-simple ownership of their property all the way up to the centerline. *Id.* at 2–3.

The government presents a starkly different vision of the scope of the taking. As to the "after" condition, it argues that the Corridor is no more than 65 feet wide either side of the centerline, or, alternatively, no more than 50 feet either side of the centerline; and that even the narrow easement is "nonexclusive," meaning that plaintiffs have the right to maintain and build overlying structures within it as long as the structures do not interfere with trail use or future rail reactivation. Def.'s Post-Tr. Br. at 4–8. The government further argues that in the "before" or "but-for" condition, Norfolk Southern would not have abandoned the railroad ROW, meaning that the government took only the *additional* burden imposed by the ITUR easement as compared to the old railroad ROW. Def.'s Mot. Summ. J. at 9–13. Finally, it argues that plaintiffs have failed to prove that any compensation is due for the additional burden.

For the reasons below, the Court concludes that the ITUR easement is up to 100 feet wide either side of the centerline, as depicted in the Survey Map; that plaintiffs have no legal or functional right to use their property within the Corridor; and that plaintiffs would have owned their property free and clear of any easement in the "before" or "but-for" condition. The Court also denies the government's motion to reopen the record.

### 2. The "After" Condition of the Property

### a. Width of the Easement

Start with the dimensions of the ITUR easement. The Kotis Entities maintain that the easement is up to 100 feet wide either side of the centerline, as depicted in the

Survey Map. Pls.' Reply Br. at 6. The government argues that the true width of the former railroad ROW was either "65 feet or less" at every subject property, as depicted in the 1927 valuation map, or "50 feet" or less at every subject property, based on Norfolk Southern's alleged "historical use" of plaintiffs' property. Def.'s Br. at 4. The government further contends that the ITUR easement is similarly narrow because "the railroad cannot give what it does not have." *Id.* (quoting *Toews v. United* States, 376 F.3d 1371, 1376 (Fed. Cir. 2004)). As for the Survey Map, the government considers it irrelevant because the nonwarranty deed to which the map is attached "neither warrants nor professes that the title is valid." *Id.* at 5 (quoting *Thompson v. United States*, 101 Fed. Cl. 416, 421 n.4 (2011)).

               *i.*   *The Corridor description adopted by the STB is dispositive.*

     The parties incorrectly presume that the Court can determine the width of the ITUR easement *de novo*. An alleged taking by the federal government can give rise to two types of actions. First, property owners can challenge the taking wholly or in part. *See, e.g.*, *Preseault I*, 494 U.S. at 14 (assuming without deciding that a Trails Act conversion is a taking, then declining to invalidate it). Second, they can bring a claim for just compensation—but to do so, they must concede the validity of the government actions that resulted in the alleged taking. *Gahagan v. United States*, 72 Fed. Cl. 157, 161 (2006) (citing *Florida Rock Indust., Inc. v. United States*, 791 F.2d 893, 898 (Fed. Cir. 1986)). As a result of this two-tiered structure, a court's powers depend on whether it is deciding an invalidation claim or a just compensation claim. In the first kind of case—which is properly brought in federal district courts, not this Court— judges have leeway to construe the scope of a taking narrowly to "avoid[] . . . a constitutional difficulty." *United States v. Riverside Bayview Homes, Inc.*, 474 U.S. 121, 128 (1985) (citing *Ashwander v. TVA*, 297 U.S. 288, 341–56 (1936) (Brandeis, J., concurring)).

     In the second kind of proceeding, however, courts must first ask whether "the legislative branch and executive agencies to which the legislature has delegated condemnation authority . . . [have already] determine[d] the scope of taking necessary for the public purpose." *Narramore v. United States*, 960 F.2d 1048, 1050 (Fed. Cir. 1992). If the answer is yes, then the court's only job is to "fix[] the amount of just compensation—'the price of the taking'—for the property *described in the [condemnation] filing*." *Id.* (emphasis added). Indeed, in just compensation proceedings, "[f]ederal court jurisdiction does not extend beyond the scope of the [condemnor's] filing." *Id.* And it certainly does not extend beyond the condemnation court's judgment approving the condemnor's filing. *Id.*

     Although our Court sits as a just compensation court, *Preseault I*, 494 U.S. at 14, the *Narramore* principle seldom has bite in our cases because usually there is no authoritative document that constitutes the final word of the Legislature or the Executive. For example, in "flood-taking" cases, *see, e.g.*, *Arkansas Fish & Game*

*Comm'n v. United States*, 568 U.S. 23 (2012), the scope of the implicit taking is determined by hydrological forces, not an official pronouncement.

Trails Act takings are different, however, because they are something of a hybrid between direct condemnations and inverse condemnations. They are inverse condemnations in the sense that the government does not pre-emptively acknowledge that a taking has occurred. The government has good reason not to admit a taking *ex ante* because not all Trails Act conversions effect a taking. *See, e.g.*, *Rogers v. United States*, 814 F.3d 1299 (Fed. Cir. 2015). But whatever the reason, the taking is implicit all the same, making "Rails-to-Trails takings . . . markedly different from . . . direct condemnations" for some purposes, such as selecting the rate at which interest accrues on just compensation owed. *Hardy v. United States*, 138 Fed. Cl. 344, 350 (2018).

But Trails Act takings are markedly *similar* to direct condemnations in another respect: The taking is effected as a result of formal filings by the railroad and trail sponsor, and there is an official document approving the putative taking, the NITU. Indeed, the analogy between a condemnation court's judgments and the NITU is foundational to the rails-to-trails jurisprudence: In *Caldwell v. United States*, a seminal case, the Federal Circuit concluded that the NITU is the sole government action that could effect a taking by analogizing the NITU to a condemnation court's "judgment" initially permitting "immediate possession" and eventually sealing "the formal passage of title." 391 F.3d at 1234 (discussing *United States v. Dow*, 357 U.S. 17 (1958)).

Thus, *Narramore* applies in Trails Act cases, and our inquiry begins with the NITU. If the NITU adopts a description of the ITUR easement, then the inquiry ends there too, for our Court, being a just compensation court, may not attempt to "expand *or contract*" the scope of the NITU. 960 F.2d at 1050 (emphasis added).[14] This remains true even if the NITU approves a wider ITUR easement than that contemplated under the Trails Act, because the STB's actions, though contrary to statute, would still be "authorized" for purposes of the Tucker Act. *See* Part IV.A.2.a.iii, *infra*; *Del-Rio Drilling Programs, Inc. v. United States*, 146 F.3d 1358, 1362 (Fed. Cir. 1998) (Tucker Act remedy available when government agents' actions "are pursuant to the good faith implementation of a Congressional Act" (internal citation and quotation marks omitted)). Therefore, the NITU is the authoritative document through which Congress and the STB impose an ITUR easement, *Caldwell*, 391 F.3d at 1234, and the corridor description adopted therein is binding on this Court.

No more is needed to fix the dimensions of the Corridor. The NITU clearly adopts the Survey Map on which plaintiffs rely. Throughout the exemption proceeding, Norfolk Southern and the City made clear that they seek a NITU as to a corridor up to 100 feet wide either side of the centerline (up to 200 feet in total). The railroad's

---

[14]    The *Narramore* principle applies to all just compensation courts, including those that otherwise have the power to award equitable relief. But it applies with special force to this Court because we cannot issue equitable relief as a general matter, *Ministerio Roca Solida v. United States*, 778 F.3d 1351, 1355 n.2 (Fed. Cir. 2015), and "none of the limited exceptions" to the general rule "apply to enjoining takings," *Graves v. United States*, 160 Fed. Cl. 562, 574 (2022).

notice of exemption stated, per 49 C.F.R. § 1152.22(a)(4), that "[t]he right-of-way width ranges from 50 feet to 200 feet along the main track centerline." Notice of Exemption at 31, *Exemption Proceeding* (filed on Aug. 26, 2019). The City's petition for interim trail use, which was required to include an "accurate description" of the proposed ROW under 49 C.F.R. § 1152.29(a)(1), similarly clarified that "[t]he right-of-way which pertains to this request is the same as that described in [Norfolk Southern's notice of exemption]," and the petition included a bird's-eye-view version of the Survey Map. Petition for Trail Use at 2, 4, *Exemption Proceeding* (filed on Sep. 13, 2019). The STB's staff then performed its environmental analysis based on the assumption that "the right-of-way with ranges from 50 to 200 feet along the main track centerline." Environmental Assessment at 1, *Exemption Proceeding* (filed on Sep. 20, 2019). Finally, the NITU permitted Norfolk Southern and the City to negotiate an agreement "for trail use [of] *the Line*"—a term defined earlier in the NITU as referring to the ROW described in the railroad's notice of exemption. JX83 at 3 (emphasis added). Thus, the NITU adopted the Survey Map, and the Court must treat that description as given for purposes of determining just compensation.

Given the STB's clear-eyed approval of the Survey Map, one might wonder why the government is arguing that this Court should not rely on it. The answer is that the STB disclaims any authority or obligation to inspect the substance of the railroad's and the sponsor's submissions in a trail-use proceeding. Even though the agency presides over the proceeding, it has decided to "play no part in the parties' negotiations," going so far as to decline to even "analyze . . . [the] trail use agreements." *Geo. Great S. Div., S.C. Cent. R.R.—Aban. & Discontinuance Exemption*, STB No. AB 389 (Sub-No. 1X), 2003 WL 21132515 at *4 (May 9, 2003). The STB believes that its practice is not just permitted but mandatory: It must approve trail-use petitions because Congress has assigned the agency an "essentially ministerial" role in administering the Trails Act. JX74 at 2 (quoting *Goos v. ICC*, 911 F.2d 1283, 1295 & n.8 (8th Cir. 1990)).

That assertion does not hold water. For starters, it may not even be legally relevant. Assuming that Congress assigned merely a ministerial role to the STB, Congress has essentially pre-approved whatever description of the new easement railroads and trails sponsors choose to include in their condemnation filings. With respect to *Narramore*, then, the only difference would be that the Survey Map was adopted by the "legislative branch [instead of] executive agencies." 960 F.2d at 1048. Furthermore, if the STB's role is indeed ministerial, the new easement is not only "authorized" under *Del-Rio*, but *legal*, because Congress of course has the authority, under its eminent domain power, to replace an assumedly narrow railroad ROW with a wider ITUR easement.

In any event, the STB's position is dubious for two reasons. First, the decision on which the STB relies merely held that the STB "lacked any discretion to decide whether rail banking and [trail use] is desirable for a particular line," and could not deny petitions for trail use on that basis. *Goos*, 911 F.2d at 1295. But in this case, the government is arguing that the old railroad ROW is narrower than the STB supposed— meaning that the STB *acted outside its jurisdiction* in approving the City's petition to

impose an ITUR easement on the outer reaches of the Corridor-as-surveyed. Nothing in *Goos* supports the extraordinary conclusion that Congress prohibited the STB from determining the extent of its own jurisdiction in trail-use proceedings.

Second, the STB's position is flatly contradicted by its practice of sometimes requiring railroads to disclose the nature of their property interest. *See Metro. Transit Auth. Harris Cnty., Tex.—Acquisition Exemption*, STB Nos. FD 35846& 35847, AB-33 (Sub-Nos. 156, 253X), 2015 WL 331065 (Jan 26, 2015); *S. Pac. Transp. Co.—Aban.*, ICC No. AB-12 (Sub-No. 108) (Aug. 26, 1986). Turns out, the STB can peer behind the curtain after all.

In sum, the government's problem is entirely of its own making. The STB should, properly speaking, ascertain the physical extent of its own jurisdiction instead of blindly relying on representations made by railroads and sponsors. Had it done so, the federal taxpayer may have saved a lot of money, and not just in this case. *See* Dave Owen, The Realities of Takings Litigation, 47 BYU L. Rev. 577, 610 fig.2 (2022) (nearly three-fourths of the federal government's *total* just compensation bill attributable to Trails Act takings). And it would have saved the monies in the constitutional way: by taking all the land needed to fully vindicate the mandate of the Trails Act, but no more. But regardless of the wisdom of the STB's current practice, one thing is clear: This Court's powers do not increase merely because the STB has decided to shrink its own.

> *ii. Defendant is judicially estopped from arguing that the STB adopted the wrong description of the Corridor.*

The Court further holds that, even if a just compensation court could disregard the description of the ITUR easement adopted in the NITU, defendant is judicially estopped from making that request, because the STB continues to take conflicting legal positions in its own proceedings. During the pendency of this litigation, the City petitioned the STB for "clarification" that the NITU "may be narrowed [along a 264-feet-long stretch of the Corridor] from a width of 100 feet from the center line to at most 50 feet in connection with a land sale to Kotis Properties." PX343.

In response to the City's petition, the railroad argued that the City should have filed a petition to vacate, or initiated an adverse abandonment proceeding, but the STB permitted the City's clarification petition to proceed. Board Decision, *Exemption Proceeding* (issued on June 28, 2023). The STB then granted the City's petition, thus lifting the railbanking obligation from the relevant portion of the Corridor. Clarification Decision, *Exemption Proceeding*.

Recall, at this point, that "clarification" petitions are different from petitions for partial vacatur of the NITU. A vacatur reverses the taking and restores the status quo, and it can therefore be understood as a *mea culpa* by the STB. In contrast, a "clarification" lifts the railbanking obligation—dropping the "I" and "R" from "ITUR"—from the sponsor's easement, modifying the legal relationship between the

City and the STB, but restoring nothing to the only parties that owned any interest in the corridor pre-conversion, the landowners and the railroad.

It is unclear why the STB thinks that lifting the railbanking obligation would not immediately trigger abandonment in the *property owners'* favor. *See* 28 U.S.C. § 1247(d) (providing that interim trail use "shall not be treated . . . as an abandonment of the use of [the subject] rights-of-way for railroad purposes" but only as long as "such interim use is subject to restoration or reconstruction for railroad purposes"). But putting that problem aside, by granting the City's clarification petition *or even reaching its merits*, the STB necessarily decided that it had jurisdiction over the portion to be "clarified"—which extends up to 100 feet each side of the centerline.

The STB thus took a position directly in conflict with the government's position in this litigation—as its decision expressly noted. Board Decision at 2 n.3, *Exemption Proceeding* (issued on June 28, 2023). The government is thus simultaneously claiming (through the STB) that it *took* a wide easement, but (through the Department of Justice) that it need only *pay* for a narrow easement.

This doublespeak is a transparent attempt to circumvent the Kotis Entities' constitutional right to just compensation. *United States v. Dickinson*, 331 U.S. 745, 750 (1947) ("[F]or all that the Government takes it must pay."). Courts have the inherent equitable power to foreclose just such a result by applying the doctrine of judicial estoppel. The doctrine, which applies both within a single proceeding and across multiple proceedings arising from the same set of facts, is "designed to protect the integrity of the judicial process by preventing a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase." *Haggart v. Woodley*, 809 F.3d 1336, 1345 (Fed. Cir. 2016) (alterations and internal quotation marks omitted). Although the doctrine is "not reducible to any general formulation or principle," the "main factors" that counsel application of the doctrine are whether "(1) a party's later position is clearly inconsistent with its prior position, (2) the party successfully persuaded a court to accept its prior position, and (3) the party would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped." *Id.* (internal quotation marks omitted). "Judicial estoppel applies just as much when one of the tribunals is an administrative agency as it does when both tribunals are courts." *Trustees in Bankr. of N. Am. Rubber Thread Co. v. United States*, 593 F.3d 1346, 1354 (Fed. Cir. 2010).

The STB's exercise of jurisdiction over land 100 feet away from the centerline in the "clarification" orders is clearly inconsistent with the government's position in this Court that the ITUR easement is no wider than 65 feet on each side. The STB's view was also "successful" by definition because it was the adjudicator, not merely a litigant.[15] Finally, adopting the defendant's position in this Court would unfairly

---

[15]    At least in the takings context, it is immaterial that the STB is technically not a litigant in proceedings before itself. Although the NITU authorizes a transaction between third parties (the railroad and the trail sponsor), the transaction is permissible only because it is for a "public use." U.S. Const. Amend. V. The federal government, standing in for the public, is therefore a legal beneficiary

burden plaintiffs because they would receive compensation for the taking of the narrower tract even as the City, as the trail operator and as the agent of the STB, continues to exercise control over the wider tract. Thus, the test for judicial estoppel is met, and defendant is barred from arguing that the NITU adopted an incorrect description of the ITUR easement.[16]

> ### iii. The width of the railroad's former ROW does not control the scope of the City's ITUR easement.

Finally, the Court turns to the government's argument from common law. As the Court understands it, the government appears to break down the analysis into two parts. First, it argues that "the *rail* easement pre-transfer and post-transfer is identical as a matter of law," Def.'s Mot. Summ. J. at 12 (emphasis added), "because the quitclaim or nonwarranty deed executed between Norfolk Southern and the City "could not have conferred more property interest that [the railroad] actually owned," *id.* (citing, *inter alia, Van Rensselaer v. Kearney*, 52 U.S. 297, 322 (1850)). Second, the government acknowledges that there is no *rail* easement post-transfer, but nonetheless argues that the ITUR easement can be no wider. *Id.* As for compensation, the government acknowledges that the ITUR easement may impose an additional burden as compared to the railroad ROW, but requests judgment in its favor on the grounds that plaintiffs "have developed no evidence" proving the amount of just compensation due for the additional burden. *Id.* at 13–14.

The government falters at the very first step. The scope of the taking is defined not by the quitclaim deed, but by the "*only government action* in the railbanking process" that gives rise to a taking—the NITU. *Caldwell*, 391 F.3d at 1233 (emphasis in original). If it were true that the Corridor is narrower than the STB supposed, the government would have proven merely that the NITU deprived the property owner of a wider tract than the railroad owned. Although it is true that "[t]he consent of the *railroad* to the new use . . . does not change the equation—the railroad cannot give what it does not have," *Toews*, 376 F.3d at 1376 (emphasis added), the STB, exercising Congress's eminent domain power, *can* give what the railroad does not have. To the extent that this raises concerns about the STB running afoul of the Trails Act, the proper course would have been for the STB to rescind, post haste, the NITU as to the excess land. Since the STB has failed to do so and the Court has no trouble concluding

---

of the transaction. And because the government is a beneficiary, when the STB aggressively asserts jurisdiction over a wide tract, the government extracts an "advantage," *Haggard*, 809 F.3d at 1345, for itself. Furthermore, the condemnation proceeding before the STB and the just compensation suit in this Court are but two "phase[s]" of the same case, *id.*, in the eyes of the Fifth Amendment. The doctrine of judicial estoppel is therefore appropriately triggered.

[16]     Alternatively, on the merits, plaintiffs are correct that the Survey Map accurately depicts the width of the ITUR easement taken. The Court reaches that conclusion for the reasons explained in *Agapion*, 167 Fed. Cl. at 773–74. In that case, the Court considered the same NITU and easements, and the parties presented very similar (though not exactly the same) evidence at trial regarding the width of the easement.

that its actions were "authorized" even if contrary to statute, just compensation is available as to the entire Corridor. *Del-Rio*, 146 F.3d at 1362.

> ### iv. The government's motion to reopen the trial record is denied.

The Court now turns to the government's motion to reopen the trial record, in which it asks the Court to admit into evidence the STB's decision granting the City's "clarification" petition, which narrowed a 264-foot strip of the 3.1-mile Corridor abutting two subject parcels, 1310 Westover Terrace and 1500 Mill Street,[17] from 100 feet to 26 feet. The Court has the discretion to admit additional evidence. *Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 401 U.S. 321, 331 (1971). The primary consideration is whether the proferred evidence has probative value. *Precision Pine & Timber, Inc. v. United States*, 596 F.3d 817, 834 (Fed. Cir. 2010).

The motion is denied. The government thinks that the evidence is relevant because the STB's decision (1) restores the strip at issue to the status quo *ex ante*, thus "convert[ing] the [permanent] taking into a 'temporary' one," Def.'s Mot. Reopen Tr. Rec. at 4 (quoting *First English Evangelical Lutheran Church v. Cty. of Los Angeles*, 482 U.S. 304, 320 (1987)) (alterations added); and (2) undermines Dr. Kilpatrick's assumptions about the width of the Corridor and the extent to with its overlaps with existing and planned development on the subject properties, *id.* at 5–7.

Both arguments are incorrect for the same reason: The STB's decision merely expands the City's rights over the Corridor; it does not restore any rights to the plaintiffs. The City's petition did not request vacatur but a "clarification." Petition for Clarification at 1, *Exemption Proceeding* (filed on Dec. 7, 2022). It sought to have the strip "narrowed from a width of 100 feet from [the] center line to at most 50 feet in connection with a *land sale* to Kotis Properties . . . to develop an important grocery store." *Id.* at 1 (emphasis added); *see also id.* at 7–8 & Ex. 3 at 7. The City fully understood that the petition, if successful, would lift the railbanking obligation and allow the City to sell the land back to Mr. Kotis. *See id.* at 7–8. And with good reason: The STB decision on which it relied allowed the trail sponsor to "convey the [clarified] 50-foot-wide portion to" a third party, the Texas Department of Transportation, "to improve a segment of U.S. Highway 82"—a non-rail, non-trail purpose. *Mo. Pac. R.R. Co.—Aban. Exemption*, STB No. AB 3 (Sub No. 137X), 2021 WL 3235207 at *2 (July 27, 2021).

It is of course possible that the STB granted the City's petition without adopting the City's view of the legal consequences, but that is not what happened here. The STB narrowed the railbanking obligation on the southside—where the Corridor abuts the subject properties—from 100 feet to 26 feet. Clarification Decision, *Exemption Proceeding*. It found that portion of the Corridor at issue was not needed for future rail reactivation, and specifically stated that the decision did not vacate the NITU. *Id.* at 2.

---

[17]     The total length of the border between the Corridor and those parcels is 952 feet. *See* JX41, JX44.

And although it did not explicitly mention that the City may sell the strip to a third party, throughout the discussion, it relied principally on the *Missouri Pacific* decision. *Id.* at 2–3. Thus, the NITU did not alter the landowners' property rights in any way, only the City's.

The government finds it relevant that the City intended to convey the strip back to Mr. Kotis for two reasons. As to each ground, the government's position is understandable, but ultimately incorrect.

The government first argues that the putative conveyance would render the taking temporary. That is untrue. Although it is true that "[i]f the NITU expires, is revoked, or is modified to exclude land, then a temporary—not permanent—taking may be effected," Def.'s Reply Mot. Reopen Tr. Rec. at 4, ECF No. 195, a clarification order does none of those things. It claims to narrow the scope of the NITU, but, in the same stroke of the piston, hands the non-railbanked property over to the sponsor, who, recall, would have held no interest in the property had the NITU never been issued in the first place. *Mo. Pac.* at *2, STB No. AB 3 (Sub No. 137X). Therefore, the taking is not reversed either in size or scope, nor is Dr. Kilpatrick's analysis undermined in any way.

Second, the government suggests that if Mr. Kotis was able to buy his property back from the City for less than fair market value, the compensation amount should be reduced accordingly. Def.'s Reply Reopen Tr. Rec. at 7 n.3. That is also incorrect. A transaction between the City and Mr. Kotis, assuming that it has taken place at all, is a "[d]ecision rest[ing] solely in the hands of" parties other than the government. *Memmer v. United States*, 50 F.4th 136, 146 (Fed. Cir. 2022). As such, it does not diminish the government's "responsib[ility] for mandating the continuation of the easement." *Id.* Nor would Mr. Kotis be double-dipping. Landowners who persuade local governments to sell property at below-market rates often "pay" in the form of non-monetary concessions. The Court will not inquire into how the political sausage is made.

Thus, the STB's clarification decision does not affect the taking and just compensation analysis in any way, and the motion to reopen the trial record is denied.

### b. Exclusivity of the Easement

The parties also disagree about whether the ITUR easement is exclusive. Plaintiffs argue that it is, because the City and the STB can dictate the use of the entire corridor for trail use and potential rail reactivation, respectively. Pls.' Post-Tr. Br. at 3–5. This position, if correct, implies that plaintiffs have no right to maintain current overlying structures or build new overlying structures, and should therefore be compensated for the attendant loss in the fair market value of each parcel as a whole.

The government makes two interrelated arguments in opposition. First, it asserts that the easement is nonexclusive, meaning that property owners have the *legal right* to use the Corridor as long as the use does not conflict with trail use and railbanking.

Def.'s Post-Tr. Br. at 6.  Baked into this argument is the assertion that nonexclusivity is functionally meaningful, in that the Kotis Entities' existing and planned commercial uses of portions of the Corridor *do not* conflict with trail use and railbanking, and therefore *cannot* be removed or blocked by the City and the STB.  *Id.*  Second, it argues that easement is functionally nonexclusive even if the Kotis Entities' use of the Corridor conflicts with interim trail use and railbanking, because the City and the STB *will not* require property owners to remove existing structures or prevent them from building new ones.  *Id.* at 7–8.

Plaintiffs have the better of the argument.  Our Court often finds that a fee simple landowner effectively loses all property rights within the corridor of a Trails Act easement.  *See, e.g., Jackson v. United States*, 155 Fed. Cl. 689, 702 (2021) (collecting cases).  Through a Trails Act transfer, the trail sponsor obtains the authority to dictate how much of the corridor it needs, or will need in the future, to construct and operate the recreational trail.  *See* 16 U.S.C. § 1247(d); *Caquelin*, 959 F.3d at 1367.  And the STB retains the authority to decide whether the full corridor *might be* needed for purposes of reactivating the rail line at some point in the future.  *See Caldwell,* 391 F.3d at 1229 (observing that "the STB retains jurisdiction for possible future railroad use" in Trails Act corridors).  The intended consequence of this allocation of control is that the landowner retains no right to use the encumbered portion of the corridor in the face of a conflicting *position* taken by the City or the STB.  *See Hardy*, 141 Fed. Cl. at 16–17 ("[P]laintiffs have no remaining use of the land burdened by the trail easement . . . .").

The Court sees no basis to reach a different conclusion here.  The taking for which plaintiffs are entitled to just compensation is the destruction of their property interest within the Corridor, s*ee Caquelin*, 959 F.3d at 1367–68, and the resulting reduction in the value of their land associated with this loss of property interest, *see Otay Mesa*, 670 F.3d at 1364.  To build or maintain overlying structures on a portion of the Corridor, the Kotis Entities must have the legal right to exclude the City and the railroad from that portion in the event of a conflicting use, now and in the future.  *Caquelin*, 959 F.3d at 1367 (observing that the Trails Act creates "a coerced easement that impairs the landowner's right to exclude by allowing others' occupation.").

Plaintiffs undoubtedly lack that right.  In its capacity as the trail operator, the City has exclusive control over all uses within the Corridor while it is used for a recreational trail.  *Illig v. United States*, 58 Fed. Cl. 619, 631 (2003); *Jackson*, 155 Fed. Cl. at 701.  This gives the City the inherent ability to determine whether another's use of the easement conflicts with its own trail needs and to *revise that determination when its plans change*.  *See Norfolk S. Ry. Co. v. Smith*, 169 N.C. App. 784, 789 (N.C. Ct. App. 2005) (finding that the holder of a dominant ROW "may *expand* its use of the right-of-way, to the extent of its statutory right, for any legitimate purpose as determined by [its] sound business judgment" (emphasis added)); *see also Trevarton v. South Dakota*, 817 F.3d 1081, 1087 (8th Cir. 2016).  The City's current plan may well be to use only a narrow strip near the centerline for trail purposes, JX103 36:20–37:5, but the record shows quite concretely that that might change in the future.  For example, the City's greenway system—of which the subject trail would be a part—

contains the following: upgrades that enable "some level of passive programming, environmental education;" "parklets" to host "things like exercise classes"; "Ebike[]" stations; "[w]ater fountains"; "[r]estrooms"; and land set aside for conservation purposes. JX103 35:10–12, 14–16, 18–21, 36:4–5, 36:20–37:5; JX1448 228:13. If and when the City upgrades the Corridor to include such features, the City's right to trail use will conflict with, and supersede, plaintiffs' right to maintain or build overlying structures. And although the *current* City administration might refrain from exercising its right to demolish existing overlying structures, administrations change. Thus, the City's trail use easement is exclusive for all intents and purposes.

In addition, the City's obligation to railbank imposes a second layer of exclusivity within the Corridor. The STB can *continuously* regulate any uses of the Corridor that may conflict with rail use now or in the future. *See* 49 U.S.C. § 10501(b) (The STB's jurisdiction over rail line construction and maintenance is "exclusive"); *Caldwell,* 391 F.3d at 1230 ("[T]he STB retains jurisdiction for possible future railroad use."); *Preseault III,* 100 F.3d at 1552; *Dana R. Hodges Trust*, 111 Fed. Cl. at 457. The STB's definition of a conflict is open-ended: "[N]othing [can] occur[] that would preclude a railroad's right to reassert control over the ROW at some future time to revive rail service." *King Cnty., Wa—Acquisition Exemption*, STB Fin. Dkt. No. 35148, 2009 WL 2979430 at *3 (Sept. 17, 2009). A use is deemed to be conflicting even if it has "little actual, practical effect on current plans for active railroad operations" because "circumstances can change." *Jie Ao & Xin Zhou—Pet. for Decl. Order*, STB Dkt. No. FD 35539, 2012 WL 2047726 at *7 (June 4, 2012). Furthermore, although the STB does "allow[] for the possibility of shared use," *Norfolk S. Ry., Co. v. Dille Rd. Recycling, LLC*, 94 F.4th 517, 525 (6th Cir. 2024) (citing *Jie Ao*, 2012 WL 2047726 at *6–*7), the analysis proceeds patch by patch. A shared use is *not* viable if the property owner is "carving out property that is part of a railroad [ROW]" and thus not "allow[ing] the railroad to access" *the carved-out portion* of the property. *Id.* Thus, plaintiffs have no legal right to build or maintain overlying structures in any portion within the Corridor for the additional reason that the STB—or the City, as its delegate for railbanking purposes—may determine, now or in the future, that structures conflict with the use of that portion for potential rail reactivation. *Id.*; *Caldwell,* 391 F.3d at 1229; *Illig*, 58 Fed. Cl. at 631.[18]

---

[18]    In the next section of this opinion, the Court rejects defendant's argument that the subject properties would have been burdened by the former railroad ROW in the "before" or "but-for" condition. Even if defendant were right about the "but-for" condition of the property, the holding in this section would still apply. Although the government thinks that the additional burden caused by an ITUR easement is synonymous with the additional burden of trail use, that is a false equivalence. Railbanking is *more* burdensome than a railroad ROW, especially an inactive one. A property owner is much more likely to succeed—not only in practice, but as a matter of law—in acquiring the right to use a portion of a railroad ROW than an ITUR easement. While the railroad still owns the ROW, the property owner need not obtain regulatory approval from the STB before leasing the corridor from the railroad. *See, e.g.*, *Consol. Rail Corp.—Petition for Decl. Ord.*, STB Fin. Dkt. No. 33296, 1996 WL 714556, at *2 (Dec. 10, 1996). A party petitioning to let the property owner use the Corridor is also not required to argue that he would "reuse . . . [the] right-of-way for a public purpose." *See* Petition for Clarification at 1, *Exemption Proceeding* (quoting *Baltimore & Ohio R.R. Co.—Aban. & Discontinuance of Service*, STB No. AB-19 (Sub-No. 112), 1990 WL 287371 at *2 (Feb. 22, 1990). In

### 3.  The "Before" or "But-For" Condition of the Subject Parcels

The Court now turns to the "before" or "but-for" condition of the subject properties.  Our task is to first ascertain, as a matter of law, "*which* 'but-for' world the effects of the [government action] are measured against."  *Ideker Farms, Inc. v. United States*, 71 F.4th 964, 981–82 (Fed. Cir. 2023) (emphasis added).  Then, we make findings of fact about the scope of the plaintiffs' property interest in that but-for world.  *Memmer*, 50 F.4th at 145; *Caquelin*, 959 F.3d at 1372–73; *see also St. Bernard Parish Gov't v. United States*, 887 F.3d 1354, 1366–69 (Fed. Cir. 2018).

The Kotis Entities argue that they would have owned the properties free and clear of any easement but for the taking, because:  The appropriate inquiry is what the state of the property would have been "but for the Trails Act"; and Norfolk Southern would have abandoned the former railroad ROW but for the operation of the Trails Act.  Pls.' Post-Tr. Br. at 3.  This position is grounded in a long line of cases holding that in the but-for condition, landowners have "possession of their property unencumbered by [any] easement."  *Ladd v. United States*, 630 F.3d 1015, 1023 (Fed. Cir. 2010); *accord Memmer*, 50 F.4th at 146 ("[H]ad a trail-use agreement been reached during the NITU, a taking of [the landowners'] property would have occurred."); *Barclay*, 443 F.3d at 1373; *Caldwell*, 391 F.3d at 1236; *see also Nicholson v. United States*, 170 Fed. Cl. 399, 410 (2024) (collecting our Court's cases).

The government is not unaware of the weight of the precedent.  It admits that courts "generally assume[] that the railroad would have consummated abandonment" in the absence of a taking, and that "[a]s such, the 'before' scenario ordinarily used is the fee simple value of a plaintiff's property unburdened by an easement for either railroad or [ITUR] use."  Def.'s MSJ at 10.  The government nonetheless asks the Court to adopt the theory—which it has advanced in a bevy of cases in recent months—that the appropriate legal counterfactual is the scope of the plaintiffs' property rights "in the absence of the NITU."  *Id.* at 10 (quoting *Caquelin*, 959 F.3d at 1363).  It then argues that under the but-for-the-NITU standard, Norfolk Southern would not have abandoned the former ROW.  *Id.*  As proof, the government has repeatedly sought to admit the declaration and deposition testimony of Ms. Kristi D. Blair, the Director-Real Estate of Norfolk Southern.  *See* Offer of Proof Ex. A, ECF No. 159-1 [hereinafter "Blair Decl."]; *id.* Ex. B, ECF No. 159-2.  Her declaration states that "[i]f a final trail use agreement had not been reached, Norfolk Southern would not have abandoned the Line."  *Id.* at 2.  She further states that it is Norfolk Southern's policy not to abandon rail easements unless doing so is "advantageous or necessary."  *Id.*

The Court holds that Norfolk Southern would have abandoned the Corridor but for the taking, and reiterates that Ms. Blair's declaration is of no probative value—if anything, it proves that plaintiffs have the better of the argument.

---

contrast, after the corridor is railbanked, STB approval is required; a showing of public use is required; and the STB applies a heightened standard of review.  *See King Cnty.,* 2009 WL 2979430 at *3.

> a. **The correct legal standard is whether Norfolk Southern
>    would have abandoned the Corridor but for the Trails
>    Act project.**

The first question is how the but-for test should be framed. As defendant correctly notes, the broad inquiry is whether Norfolk Southern would have abandoned the former ROW "even in the absence of the Trails Act." Def.'s MSJ at 9. The Court's task is to reduce that principle to a precise test.

Takings law is subject to ordinary but-for causation principles. *Caquelin*, 959 F.3d at 1371. The burden of proof is on the plaintiff. *St. Bernard Parish*, 887 F.3d at 1362. To ascertain whether the government took a plaintiff's property, courts ask "'what would have occurred' if the government had not acted." *Id.* (quoting *United States v. Archer*, 241 U.S. 119, 132 (1916)). A property interest has been taken if "in the ordinary course of events, absent government action," plaintiffs would have retained the interest. *Id.*; *Caquelin*, 959 F.3d at 1371.

The critical question is what it means for government "not [to have] acted." *St. Bernard Parish*, 887 F.3d at 1362. Any given property in our country is touched by multiple federal programs, which in turn usually authorize officials to take multiple actions. Which of these actions should we imagine were never taken by the government when asking "what would have occurred"? No court has provided a comprehensive answer to that question, but this much is clear: we may not slice and dice government initiatives. Under the scope of the project rule, courts must ignore "the positive or the negative impact of any decision the Government makes within the scope of the project that prompted the taking." *Love Terminal Partners, L.P. v. United States*, 889 F.3d 1331, 1347 (Fed. Cir. 2018) (citation omitted). There is "no bright line rule" to determine whether two actions are within the scope of the same project, *Ideker Farms*, 71 F.4th at 982 (quoting *United States v. Reynolds*, 397 U.S. 14, 18 (1970)), but the relevant factors are whether: (1) "reasonable property owners at the time the taking occurred" thought that the actions are part of the same project; (2) the government made the same representation; (3) the action taken later in time was foreseeable at the time of the initial action; and (4) the actions were close in time, *id.* For example, if the government condemns multiple parcels of real property to build a reservoir, the condemnation actions are part of the same project—meaning that in the just compensation phase of *every* condemnation action, the relevant question is what would have occurred had *none* of the properties been condemned. *United States v. Miller*, 317 U.S. 369, 370 (1943).

The Federal Circuit's rails-to-trails precedents sometimes appear to imply that the scope of a Trails Act project is never in dispute because there is only one relevant government action: 'the' NITU. *See, e.g., Hardy v. United States*, 965 F.3d 1338 (Fed. Cir. 2020) (quoting *Caquelin*, 959 F.3d at 1363) ("[T]he NITU takes nothing from the landowner that the landowner would have had in the absence of the NITU."); *Caldwell*, 391 F.3d at 1233 ("The issuance of the NITU is the only government action that operates to prevent abandonment of the corridor." (emphasis deleted)). Taking a cue

from those statements, the government equates "the absence of the Trails Act" with the nonissuance of the NITU issued by the STB on October 11, 2019.  Def.'s MSJ at 10.

But matters are more nuanced than that.  Had the NITU not issued on October 11, 2019, Norfolk Southern could have decided not to consummate the abandonment and seek *another* NITU (and another, and another) until a Trails Act conversion was successful.  Thus, if the Court adopted *Caquelin*'s but-for-*the*-NITU test in the context of a successful Trails Act conversion, there would be no guarantee that plaintiffs would be free from a taking in the but-for condition.  By the very definition of the term "but for," that is a paradox.

Fortunately, circuit precedent also illuminates a path for avoiding the absurdity.  A NITU is not the taking, just the "finite start" of one.  *Caldwell*, 391 F.3d at 1235.  Its hypothetical absence, therefore, would merely imply that the taking would not *start* on the day it did—here, October 11, 2019.  The only way to ensure that a taking does not occur at all is to assume that *no* NITU will ever be issued as to the subject corridor. After all, Congress's "project" in enacting the railbanking provision was to "*preserve* railroad rights-of-way,"[19] *Bywaters v. United States*, 670 F.3d 1221, 1225 (Fed. Cir. 2012) (emphasis added)—a long-term program implemented by extending a *standing* offer to approve a rails-to-trails conversion whenever the railroad finds a willing sponsor.  Thus, the relevant question is not what would have happened but for the issuance of *the* NITU; rather, it is what would happened if, on October 11, 2019, the STB made clear that it would *never* issue a NITU as to the Corridor.

The but-for-any-NITU test is not just *consistent* with precedent—it is the only way to make sense of the rules governing rails-to-trails conversions under two different fact patterns.  The first is presented in *Caquelin*.  There, the STB issued a NITU; negotiations failed; and after searching in vain for a replacement trail sponsor, the railroad opted to abandon the line.  959 F.3d at 1362.  Upon abandonment, the STB was immediately divested of jurisdiction over the line—including jurisdiction to issue NITUs as to the line.  *Jenkins v. United States*, 102 Fed. Cl. 598, 613 (2011) (citing *Nat'l Wildlife Fed'n v. ICC*, 850 F.2d 694, 702 (D.C. Cir. 1988)).  With the legal authority to issue NITUs extinguished, 'but for any NITU' reduces to 'but for the NITU.'  There is, therefore, no contradiction.  To the extent that any doubt remains, the appeals court later confirmed in *Memmer*—a case with virtually the same facts as *Caquelin*—that *Caquelin* did not work a radical change in the law governing successful Trails Act conversions.  50 F.4th at 146 ("[H]ad a trail-use agreement been reached during the NITU, a taking of . . . property would have occurred.").

---

[19]    The Trails Act works in concert with other legal provisions to preserve rail corridors. *See, e.g.*, 49 U.S.C. § 10905 (authorizing the Board to impose so-called public use conditions in an exemption proceeding if the Corridor is "appropriate for use for public purposes, including highways, other forms of mass transportation, conservation, energy production or transmission, or recreation").  The Court is not asked to decide whether such statutes are also within the scope of the same project.

The second fact pattern arises when an ITUR easement is successfully established, but only after the STB issues multiple NITUs as to the same corridor. *See, e.g.*, *Barclay v. United States*, 443 F.3d 1368, 1375 (Fed. Cir. 2006). In these circumstances, the NITUs are considered a "single and continuous government action,"[20] *id.*, again confirming that relevant "project" is the STB's *standing* offer to issue NITUs *whenever* the railroad can find a willing trail sponsor.

Thus, the Court applies the but-for-any-NITU test, under which the causal inquiry is whether Norfolk Southern would have abandoned its ROW had the STB (1) declined to issue the October 11, 2019 NITU, and (2) announced that it would deny all future NITU requests as to the Corridor.

### b. Norfolk Southern would not have abandoned the Corridor but for the Trails Act.

To determine whether Norfolk Southern would have abandoned its ROW if the STB had declined to issue any NITUs on or after October 11, 2019, the Court turns to the STB's Trails Act regulations and the factual record. *Memmer*, 50 F.4th at 145; *Caquelin*, 959 F.3d at 1372–73; *St. Bernard Parish*, 887 F.3d at 1366–69.

At the very outset, the legal backdrop creates a strong presumption that railroads would abandon inactive corridors if the Trails Act were taken off the table. It is indisputable that, as a general matter, inactive corridors are unprofitable, leaving abandonment as "the only real financial option" available to railroads. *See, e.g.*, Testimony of Am. Assoc. Railroads at 9, STB Ex Parte No. 690 (filed June 29, 2009). That is the problem Congress set out to solve. *Preseault I*, 494 U.S. at 5. Furthermore, the STB's regulations foreclose many of the possible reasons why a particular inactive corridor might buck the general trend by ensuring that commercially viable corridors continue to be used for railway purposes. An exemption proceeding cannot even begin if a shipper has recently used *or wants to use* the rail line, since the railroad is required to certify that "no local traffic has moved over the line for at least 2 years" and "no formal complaint . . . regarding cessation of service is pending." 49 C.F.R. § 1152.50(b). Furthermore, a Trails Act conversion is an option of last resort. If a third party (such as a small town serviced by the line) makes an "offer of financial assistance" for continued rail service in the corridor, the STB gives the offer "priority over a trail use proposal because of the strong congressional intent to preserve rail service wherever possible." *N. Coast R.R. Auth.—Aban. Exemption*, STB No. AB 1305X, 2022 WL 1561434 at *7 (May 15, 2022); *see* 49 U.S.C. § 10904; 49 C.F.R. § 1152.29(d).

---

[20]    Unusual circumstances aside. *See, e.g.*, *Ladd v. United States*, 713 F.3d 648, 653 (Fed. Cir. 2013) (second NITU treated as distinct government action when the government failed to publish the first NITU in the Federal Register and its issuance was "inherently unknowable").

In other words, the railroad is only eligible for a NITU when most other avenues for financial viability have been exhausted.  Special proof is needed to show that it would have retained the corridor even if NITUs were not available.

The record lacks the requisite proof—quite the opposite.  Norfolk Southern lost its only customer on the line, Chandler/Piedmont, Inc., by 2015 at the latest, and the line had remained fallow for four years at the time of the issuance of the NITU.  There were no potential customers on the horizon:  In the words of Norfolk Southern, "not abandon[ing] the Line and retain[ing] the track in place . . . [was] not [a] satisfactory" alternative, because Norfolk Southern "would continue to incur opportunity and other holding costs that would need to be covered by *non-existent shippers*."  Notice of Exemption at 32, *Exemption Proceeding* (emphasis added).  That Norfolk Southern had no commercial use for the Corridor is further confirmed by its decision to begin negotiations with the City almost as soon as the line reached two years of inactivity, making it eligible for both abandonment and Trails Act conversion.  JX106; 49 C.F.R. § 1152.50(b).

The government thinks that Norfolk Southern employee Ms. Blair's testimony points the other way, but it does not.  Ms. Blair stated that "Norfolk Southern would not have abandoned the Line" absent the 2019 NITU and instead waited for the next "advantageous" opportunity to dispose of the Corridor.  Blair Decl. at 2.  The only concrete advantageous opportunity the Court can identify is an offer from future potential trail sponsors.  Ms. Blair or the government do not point to any other type of opportunity.  In other words, far from providing special proof that this case is exceptional, her testimony merely confirms that Norfolk Southern would have abandoned its ROW but for the Trails Act.[21]

---

[21]    Nothing in this decision should be taken to mean that a successful Trails Act conversion, in and of itself, ends the causation inquiry.  In a recent case with unusual facts, *Hardy v. United States*, the government supplied the special proof needed and persuaded our Court that the railroad would not have abandoned a segment of a rail corridor even absent the Trails Act.

In *Hardy*, the railroad and the sponsor successfully negotiated an ITUR agreement but discovered three years later that the railroad's notice of exemption and the NITU had "improperly described the location of milepost E-65.80," which marked one end of the ITUR corridor.  965 F.3d 1338, 1342 (Fed. Cir. 2020).  Upon being notified of the error, the STB vacated the initial NITU as to the segment between the supposed location and the real location of the milepost.  *Id.*  When landowners sued for a temporary taking of that segment, the Federal Circuit held that the appropriate inquiry was whether "the Railroad would have abandoned [the segment included in error] absent the NITU," and remanded the case for an evidentiary determination.  *Id.*  On remand, the government presented compelling evidence that the case presented the "rare situation" where the railroad had made a "mistake," and that the railroad's actions after the NITU was originally issued "actively contradicted" any indication of an intent to abandon the line.  *Hardy v. United States*, 153 Fed. Cl. 287, 296 (2021).  In particular, the Court found it significant that when the railroad filed its notice of exemption, it also had "active leases" on the segment, made "steady improvements" to it, and even tried to negotiate a "decades-long lease" to *operate* rail services on the segment.  *Id.*  In other words, the government prevailed precisely because it was able to prove that the disputed portion was *not* the sort of "money-losing line[]" that railroads have an incentive to abandon.  *Preseault II*, 66 F.3d at 1183.

### 4.  Summing Up

Based on a comparison of the "but-for" and "after" condition, the Court concludes that government took an exclusive ITUR easement in the corridor depicted in the Survey Map.

\* \* \*

One final point.  The government suggests that the reading adopted by the Court fails to offset the government's liability to the benefits—the "boon"—that property owners may yet reap because of proximity to "the City's planned greenway extensions." Def.'s Post-Tr. Br. at 4.  That assertion misunderstands the federal government's role. At least in this case, greenway development in the Corridor is not attributable to federal intervention.

The federal government gets the credit for trail-creation when the trail would not have been built for the Trails Act.  For example, if the rail corridor will be "lost irretrievably"[22] (through fragmentation) upon abandonment, the Trails Act can properly be treated as the reason for the creation of the trail.  Here, however, the record shows that abandonment would likely have resulted in the creation of a trail, just as it did north of the Corridor.  In fact, the City appears to have *preferred* a post-abandonment conversion to a Trails Act conversion.  All the STB did was impede the City's designs by handing Norfolk Southern a veto over trail creation.  Granted, forcing sponsors to railbank serves the public's interest in preserving our Nation's rail network, but the fact remains that had the City been free not to take the Trails Act route, the greenway may well have been built earlier and on a smaller budget, with the City and property owners agreeing to tailor the boundaries to accommodate neighboring developments.  It is for those harms—which arise not from greenway development as such, but from the federal government handing railroads the ability and incentive to foreclose the post-abandonment option—that just compensation is owed.

### B.  Valuation

The Court now turns to the quantum of compensation.  As noted previously, only plaintiffs' expert Dr. Kilpatrick provided opinions of value.  The Court finds his methodology and conclusions credible, except for his opinion that just compensation includes the cost of building privacy walls.

### 1.  Legal Standard

Just compensation equals the "fair market value" of the property assuming that it is put to its highest and best use.  *Olson v. United States*, 292 U.S. 246, 255 (1934); *see also Rasmuson v. United States*, 807 F.3d 1343, 1346 n.1 (Fed. Cir. 2015).  The Court's

---

[22]    Jeffrey Alan Bandini, *The Acquisition, Abandonment, and Preservation of Rail Corridors in North Carolina: A Historical Review and Contemporary Analysis*, 75 N.C. L. Rev. 1989, 1990 (1997).

objective is to make property owners whole—no less and no more. *See United States v. 564.54 Acres of Land*, 441 U.S. 506, 516 (1979).

The fair market value for the taking of an easement is determined using the "before-and-after method" (the "Federal Rule"), which is "the difference between the value of the property before and after the Government's easement was imposed." *McCann Holdings, Ltd. v. United States*, 111 Fed. Cl. 608, 614 (2013) (quoting *Otay Mesa*, 670 F.3d at 1364). In all events, the plaintiff bears the burden of demonstrating the quantum of compensation owed "with reasonable certainty, which requires more than a guess, but less than exactness." *Gadsden Indus. Park, LLC v. United States*, 956 F.3d 1362, 1371 (Fed. Cir. 2020) (internal quotation marks and alterations omitted). A plaintiff meets its burden when it presents "credible market evidence combined with accurate factual and legal assertions." *Agapion v. United States*, 167 Fed. Cl. 761, 774 (2023).

For the taking of an easement, just compensation includes "severance damages," which is the "diminution in value of the owner's remaining property." *Childers v. United States*, 116 Fed. Cl. 486, 497 (2013) (citation omitted); *Uniform Appraisal Standards for Federal Land Acquisitions* § 1.7.1.1 (6th ed. 2016) [hereinafter "*Yellow Book*"]. The government may pay the cost to cure in lieu of the diminution in value if the cost to cure is less than the diminution. *McCann Holdings,* 111 Fed. Cl. at 614.

## 2.   Calculation of Compensable Damages

As discussed previously, Dr. Kilpatrick calculated just compensation for each parcel as the sum of (1) the difference between the "before" and "after" value of the entire parcel, and (2) the cost of building a privacy wall between the ITUR easement and the remainder of the parcel. The Court concludes that Dr. Kilpatrick improperly added the cost of building a privacy wall, but that his conclusions are otherwise reliable.

### a.   The property owners are not entitled to recover the cost of building a privacy wall in this case.

The Court will disregard the cost of building a privacy wall. The before-and-after difference in market value is presumed to account for privacy-related harms and Dr. Kilpatrick did not attempt to rebut the presumption. The Court reaches this conclusion for the reasons stated in *Agapion*. 167 Fed. Cl. at 776–79. In that case, Dr. Kilpatrick used the same methodology, and the parties' briefs made the same arguments for and against including the additional component in the just compensation amount.

### b.   Dr. Kilpatrick's estimates of the before and after values are credible and methodologically sound.

The Court next turns to Dr. Kilpatrick's valuation of the subject properties in their before and after conditions. Dr. Kilpatrick submitted a separate report for each

subject property, JX5–JX17, and later submitted an erratum correcting some of his reports, PX82. He estimated the value of the parcels using the income approach, sales comparison approach, and cost approach, and then arrived at his opinion of the "before" value by reconciling the results of the three approaches. *E.g.*, JX5 at 28–39.

His method for estimating the after value varied depending on the effect of the taking on the remainder of the parcel. For parcels where there was "no physically possible use of the remainder," such as the Take 5 Oil property, he concluded that the after value was $0. *Id.* at 44. For parcels where the taking led to "loss of functionality of the remainder"—for example, the remainder of the Midtown Financial property was downgraded from a "Class A" to "Class B" commercial property—Dr. Kilpatrick first estimated the "after" value of the remainder by using one or more of the income approach, sales comparison approach, and cost approach. JX16 at 41–44. He then calculated the just compensation amount by adding the value of the easement taken to the diminution in value of the remainder. *Id.* at 44. Finally, for parcels where the taking did *not* diminish the desirability of the remainder, such as the Texas Roadhouse property, he calculated the value of the easement taken by multiplying the area of the taking with the per-square-foot value of the parcel in the "before" condition. JX6 at 47.

The government's expert, Mr. Stephen Roach, submitted a rebuttal report asserting that Dr. Kilpatrick's methodology is inconsistent with standard appraisal practices and his conclusions are not credible. DX44. Relying on the report, the government argues that the Court should disregard Dr. Kilpatrick's opinion because it is not based on "'sufficient facts or data'" and does not apply "'reliable principles and methods.'" Def.'s Post-Tr. Br. at 8 (quoting Fed. R. Evid. 702(b)–(d)).

The Court is unpersuaded. In his report, Mr. Roach raises a host of objections, including "theory errors, methodology errors, data errors, and inconsistencies." DX44 at 108. The Court has studied the entire report carefully. In the interest of conciseness, this opinion addresses only those objections that the government highlighted in its post-trial brief.

Defendant first argues that Dr. Kilpatrick's valuation estimates based on the income approach are unreliable, because he derived the capitalization rate from a national survey, the CBRE National Cap Rate Survey for the second half of 2019. Def.'s Post-Tr. Br. at 9; DX44 at 33–34. According to the defendant, Dr. Kilpatrick should instead have "market support" for his estimates using local market data, or at least relied on a national survey that specifically surveyed the Greensboro market. *Id.* (citing Yellow Book § 1.5.4).

The Court finds that Dr. Kilpatrick's methodology was sound. It is reasonable for expert appraisers to rely solely on survey data to estimate the capitalization rate. For example, in *Hardy*, both the plaintiffs' and the government's appraisers derived the capitalization rate based solely on a national survey (Realty Rates), and the Court found that "it was reasonable for the experts to rely on Realty Rates data." 141 Fed. Cl. at 60. Similarly, in *Franconia Associates v. United States*, both experts relied on another

national survey (the Korpacz Real Estate Survey) without any objection from the Court. 61 Fed. Cl. 718, 765–66 (2004). Further, in both cases, the national surveys appear not to have specifically surveyed the township where the taking occurred. That is unsurprising, because the whole point of national surveys is to identify trends that can plausibly be extrapolated to towns and cities not surveyed.[23]

Second, turning to the sales comparison approach, defendant argues that Dr. Kilpatrick erred by "ignor[ing] recent [pre-NITU] sales of three subject properties" and choosing comparables of a "completely different character" than the subject property. Def. Post-Tr. Br. at 9–10; DX44 at 22–25.

The Court rejects the first argument because it incorrectly presumes that the sale price prior to the issuance of the NITU—when the subject properties were encumbered by the railroad ROW—is relevant to the valuation exercise. As the Court has already explained at length, it is not. The state of the tract "before" and "after" the taking is unencumbered fee title and title encumbered by the ITUR easement, respectively. For the second argument, defendant points to the Take 5 Oil property, noting correctly that none of Dr. Kilpatrick's chosen comparable properties house an oil-change facility. Def.'s Post-Tr. Br. at 10; DX44 at 24. But when an appraiser concludes that the highest and best use of a property differs from its existing use, he must account for that difference when choosing comparable properties. *See Bd. of Cnty. Sup'rs of Prince William Cnty., Va. v. United States*, 116 F.3d 454, 457 (Fed. Cir. 1997) ("[The property owner] is entitled to the value that the [subject property] would command in the open market in light of the highest and most profitable use to which the acreage might reasonably be devoted in the near future."). That is the case here. Dr. Kilpatrick reasonably determined that the property is clearly adaptable for use as street-front retail, JX5 at 7, and properly chose comparable properties accordingly.[24]

Finally, defendant argues that Dr. Kilpatrick erred by excluding post-NITU sales in the Greensboro market. The Court rejects that argument for the reasons articulated in the *Agapion* case. 167 Fed. Cl. at 778–79.

### C. The Court's Just-Compensation Findings

After considering the totality of the record, the Court concludes as follows.

#### 1. Taking

The Court adopts the difference between Dr. Kilpatrick's before- and after-value findings as the just compensation owed to the plaintiffs. The allocation of compensation (before interest) is:

---

[23]     Defendant also asserts that Dr. Kilpatrick ignored "the subject properties' actual rental history." Def.'s Post-Tr. Br. at 9; DX44 at 30–32. That is factually incorrect. For example, he used the actual rent of the Core Life property while calculating its value under the income approach. JX7 at 37.

[24]     Defendant also raises errors that Dr. Kilpatrick corrected of his own accord. Def.'s Post-Tr. Br. at 10; PX82. The Court does not find them relevant to the assessment of his credibility.

| Parcel | Before Value | After Value | Cost of privacy wall | Just Compensation |
|---|---|---|---|---|
| **Kotis Holdings, LLC** | | | | |
| 2414 Battleground Avenue | $8,779,171 | $7,292,091 | - | $1,487,080 |
| 1430 Westover Terrace | $2,118,692 | $507,134 | - | $1,611,558 |
| 601–623 Spring Street | $1,623,777 | $0 | - | $1,623,777 |
| **Westover Terrace II, LLC** | | | | |
| 1424 Westover Terrace | $4,098,642 | $530,339 | - | $3,568,303 |
| 1420 Westover Terrace | $4,002,111 | $450,295 | - | $3,551,816 |
| 1410 Westover Terrace | $6,829,527 | $742,692 | - | $6,086,835 |
| 1310 Westover Terrace | $9,879,502 | $3,146,489 | - | $6,733,013 |
| 1500 Mill Street | $4,753,314 | $768,315 | - | $3,984,999 |
| 1305 Battleground Avenue | $12,741,309 | $3,874,590 | - | $8,866,719 |
| 1211 Battleground Avenue | $3,219,162 | $2,327,321 | - | $891,841 |
| 1209 Battleground Avenue | $3,760,250 | $2,782,326 | - | $977,924 |
| 1201 Battleground Avenue | $3,303,326 | $1,116,099 | - | $2,187,227 |
| **Kotis Associates, LLC** | | | | |
| 1715 Battleground Avenue | $1,070,648 | $0 | - | $1,070,648 |
| **Total** | $66,179,431 | $23,537,691 | - | $42,641,740 |

## 2. The Appropriate Interest Rate

For the reasons given in *Hardy*, 138 Fed. Cl. at 356, the Court awards interest to be calculated using Moody's Aaa Corporate Bond rate, compounded annually.

## V.    Conclusion

The Court finds that plaintiffs met their burden of proving their claims for just compensation and awards compensation in the amount of **$42,641,740** with interest calculated using Moody's Aaa Corporate Bond rate, compounded annually. Pursuant to RCFC Rule 54(b), there being no just reason for delay, the Court directs the clerk to enter judgment for the plaintiffs consistent with this opinion.

**IT IS SO ORDERED.**

s/ *Loren A. Smith*

Loren A. Smith,
Senior Judge